## Richmond

### GORDON L. ROME v. KELLY SPRINGFIELD TIRE COMPANY.

April 22, 1977.

Record No. 760139.

Present, All the Justices.

*Thomas P. Mains, Jr.,* for plaintiff in error.

*David M. Moore (James C. Gregg,* on brief), for defendant in error.

HARMAN, J., delivered the opinion of the court.

This is a products liability action for breach of warranty brought by Gordon J. Rome (Rome) against Kelly Springfield Tire Company (Kelly Springfield), a manufacturer and distributor of motor vehicle tires. After lengthy deliberations, a jury in the trial court found a verdict for Rome and awarded him damages in the amount of $79,918.52, the exact amount of Rome's lost wages and medical expenses shown by the evidence. The trial court, upon Kelly Springfield's motion, held that this verdict was contrary to the law and the evidence, and entered a final judgment in favor of Kelly Springfield. We awarded Rome a writ of error.

At this point it is appropriate that we delineate the questions before us for decision. Rome challenges the action of the trial court (1) in setting aside the verdict and entering final judgment for Kelly Springfield, and (2) in failing to set aside the verdict as inadequate and ordering a new trial limited to the question of damages. The record discloses that these issues were properly raised in the trial court and preserved on appeal.

Kelly Springfield assigns cross-error to rulings of the trial court in granting or refusing thirteen instructions. Nowhere in the manuscript record, or in the partial transcript of testimony and incidents of trial, does it appear that Kelly Springfield objected to the trial court's rulings on these instructions. Therefore, we will not consider the assignments of cross-error dealing with those instructions. Rule 5:21 (former Rule 5:7), Rules of Court.

Rome, the plaintiff, was seriously and permanently injured on the afternoon of July 14, 1972, when the station wagon he was driving south on Interstate Route 66 collided with the rear of a tractor-trailer truck operated by Emmett F. Pennington (Pennington). The weather was clear and the road surface was dry.

Pennington testified that he was driving his truck south in the right southbound lane of the four-lane divided highway which was straight and "a bit downgrade" at this point. He was traveling at a speed between 50 and 55 miles per hour when a blow-out occurred in his left front tire, causing his vehicle to pull suddenly toward the left, into the left southbound lane toward a metal guard rail adjoining the pavement. Pennington immediately applied the air brakes on his vehicle and steered the tractor-trailer to the right to avoid striking the guard rail. After

regaining control of his truck and slowing the truck to a "slow" speed, Pennington shifted into a "lower gear" and "glanced into the mirror to see if traffic was going to hit [him]". As he looked in the mirror, he observed that the traffic behind him had either stopped or was in the process of stopping. Pennington then relates, "when I started to cut it to the right of the road, that is when the accident happened." Pennington did not see the Rome vehicle prior to the time it struck the rear of his trailer. At the time of impact, his tractor was in the right southbound lane and "some part" of the trailer was still in the left southbound lane.

Leon Crites, an off duty police officer, was an eyewitness to the incident. He testified that he had traveled four or five car lengths behind the tractor-trailer for some time as he drove his camper-truck south in the right southbound lane of Interstate Route 66 at a speed of 60 to 65 miles per hour. The road where the accident occurred was "straight and level" with "no curves in the immediate area". Photographs of the scene, which were introduced in evidence, reveal that the road was straight for several hundred yards to the north of the point where the crash occurred. Crites heard "a loud crack" and then saw a "big puff of smoke come from the tractor". Crites observed the truck go from the right southbound lane to the left southbound lane "immediately after the explosion". He related that he "turned [his] four-way flashers on, applied [his] brakes and slowed down" in order to give the driver of the tractor-trailer "a chance to get back in front of me". Before he came to a complete stop, while he was still traveling at "maybe two miles per hour", Crites said that Rome's station wagon, traveling in the left southbound lane, "come up to my left and I heard brakes squeal and the impact happened just like that, you know". When asked to estimate the speed of Rome's car, Crites replied: "I couldn't estimate. It happened so quickly that I wouldn't even try, I don't think."

Crites stopped his vehicle, without skidding or sliding, on the right side of the highway approximately 50 feet north of the point where the truck was attempting to return to the right lane or shoulder. Crites estimated the truck's speed at this point to be three to five miles per hour. Several vehicles following Crites were also able to stop without difficulty. From the time he first observed the tractor-trailer truck's movement to the left until he came to a stop, Crites estimated that he traveled "approximately

300 feet". When asked to estimate the time which elapsed between the blowout and the time Rome collided with the truck, Crites answered, "That would be down to seconds. I would say somewhere in the neighborhood of 30 to 40 seconds. I don't know. I don't know how far you would travel in that distance." Crites testified that the two "flasher" lights on the rear of his camper were "approximately 4 feet off the ground" and that each was five to six inches in diameter, "about the size of a salad plate".

The plaintiff, Rome, testified that he was familiar with the road where the accident occurred since he traveled it twice daily in commuting between his home and place of employment. Rome, who suffered a head injury in the wreck, testified that he had no recollection of the accident or of the events which immediately preceded it. His testimony established, without contradiction, that his injuries necessitated medical expenses to the date of trial of $56,871.52 and that he had sustained a wage loss of $23,047.00 because of his injuries, with the total of those items being $79,918.52.

The evidence showed that the left front tire and tube on Pennington's tractor had been purchased "new" from and had been installed on the truck by Kelly Springfield on May 15, 1972. At the time of the blowout on July 14, the tire was only "12% worn at the center of its tread."

As one would expect in a products liability case, the cause of the blowout became a battle of experts. The plaintiff's expert testified that the tire failure was caused by defect in the placement of the various components of the tire when it was manufactured. This defect, he opined, caused heat to build up in the sidewall of the tire and resulted in a failure or breakdown in the sidewall, thus causing the blowout.

Three expert witnesses testified on behalf of Kelly Springfield. Each of them was of the opinion that the blowout resulted from a heat build up in the tire brought about by operating the tire in an under-inflated or flat condition.

Pennington testified that he gauged the air pressure in his tires each week and that he inspected them visually each day. Prior to the blowout, Pennington said he did not observe anything different or unusual about the tire or the manner in which his tractor-trailer truck operated. The clear inference from his evidence is that Pennington would have observed an

under-inflated tire upon visual inspection and that an under-inflated tire on the steering axle of his truck would change the truck's operating characteristics.

Unfortunately, the partial transcript which was filed does not contain the testimony of the police officer who investigated this occurrence. Counsel tell us the investigating officer testified and say that the fault lies with the court reporter who failed to transcribe this testimony. Since neither party objected to the transcript in the manner and within the time provided by Rule 5:11, we can only assume that the record before us accurately represents all relevant evidence necessary to our decision of this appeal.

As we noted earlier, the trial court set aside the jury's verdict for Rome and entered up final judgment for Kelly Springfield. Its reasons for doing so are found only in the final order, which recites that the verdict was contrary to the law and the evidence.

Kelly Springfield would now have us affirm the judgment by holding that the evidence discloses that Rome was guilty of contributory negligence which proximately contributed to cause the accident. In its instructions, the trial court told the jury, without objection, that Rome's negligence would be a bar to his claim against Kelly Springfield only if that negligence was the sole proximate cause of the accident. Since this instruction was not challenged, it became the law of the case and the question of the correctness of that legal principle is not before us. *Lacks* v. *Bottled Gas Corp.*, 215 Va. 94, 96, 205 S.E.2d 671, 673 (1975).

In view of the jury issue obviously created by the sharp conflict in the evidence of the expert witnesses, we can only conclude that the trial court's action in entering judgment *non obstante veredicto* was predicated upon a finding that Rome's negligence was the sole proximate cause of his injuries. That the jury could have found Rome negligent is quite clear from the evidence. But whether his negligence was the sole proximate cause of his injuries is, we believe, a question upon which fair-minded men might reasonably not agree. Having reached that conclusion, we must hold that the trial court erred when it set aside the verdict and entered final judgment for Kelly Springfield. *Meador* v. *Lawson*, 214 Va. 759, 761-62, 204 S.E.2d 285, 287 (1974).

This brings us to the second issue raised by Rome's assignments of error, *i.e.*, that the trial court erred in failing to

set aside the verdict as inadequate and to order a new trial on the issue of damages only. The verdict of the jury fixed Rome's damages at $79,918.52, the exact amount of Rome's lost wages and medical expenses to the date of trial as shown by the uncontroverted evidence. The trial court's damage instruction set forth seven elements of damage which the jury should have considered in fixing its award. The jury's award appears to represent only two of those seven elements. Substantial evidence was introduced in support of the other elements of damage mentioned in the instruction, *viz.*, past and future physical pain and mental anguish, disfigurement and deformity, past and future inconvenience, future medical expenses, and the effect of such injuries upon Rome's health. The verdict is therefore inadequate and invalid as a matter of law because it demonstrates the jury has disregarded the instruction on damages. Obviously, the jury has failed to take into consideration all of the proper elements of damages to which the plaintiff was entitled under the evidence. *Murrow* v. *Whiteley*, 125 Colo. 392, 244 P.2d 657 (1952); *Robertson* v. *Stanley*, 285 N.C. 561, 206 S.E.2d 190 (1974). For this reason, therefore, the verdict should have been set aside and a new trial ordered.

Having found the plaintiff entitled to a new trial, we must now confront the question whether there should be a new trial on all issues or on the issue of damages only. Where the question of the amount of damages is not distinctly separable from the matters involved in the issue of liability, or the evidence with reference to liability has probably exerted a material influence upon the jury in determining the amount of the verdict, or the evidence warrants the inference that, instead of deciding the question of liability, the jury has arbitrarily determined to make both parties bear a part of the burden of the injury, the verdict should be set aside and new trial granted on all issues. *Wright* v. *Estep*, 194 Va. 332, 337-38, 73 S.E.2d 371, 375 (1952).

Here, while there was sufficient evidence to support a verdict in favor of either Rome or Kelly Springfield, there was no clear preponderance of the evidence in favor of the theory of either. That the award was in the exact amount of Rome's lost wages and medical expenses to the date of trial is more than a coincidence. These circumstances indicate that the liability issue probably exerted a material influence on the jury in reaching its

verdict on damages, or that the jury arbitrarily decided to make each of the parties bear a part of the burden of the injury. Therefore, we will reverse the final judgment order of the trial court and the case will be remanded for a new trial on all issues.

*Reversed and remanded.*