RICHMOND NEWSPAPERS, INC., ET AL.

V.

VERNELLE M. LIPSCOMB

Record No. 840737

October 30, 1987

Present: All the Justices

278

*Alexander Wellford (David C. Kohler; Christian, Barton, Epps, Brent & Chappell*, on briefs), for appellants.

*John H. O'Brion, Jr. (William Allcott; Carrie L. Camp; Browder, Russell, Morris & Butcher*, on brief), for appellee.

WHITING, J., delivered the opinion of the Court.

This action for defamation brought by a Richmond public school teacher, Vernelle M. Lipscomb (Lipscomb), against Richmond Newspapers, Inc. (the newspaper), a publisher, and its reporter, Charles E. Cox (Cox), arises out of the publication of a front-page article in the *Richmond Times-Dispatch*. The trial judge sustained a jury's award of $45,000 in punitive damages against Cox, but required a remittitur of $900,000 of a $1,000,000 compensatory damage award against both defendants. We will affirm the reduced award of compensatory damages but reverse the award of punitive damages.

## I.  ISSUES

(1) Was Lipscomb, as a public school teacher, in that class of public officials which can only recover compensatory damages for defamation by establishing the constitutional malice described in *New York Times* v. *Sullivan*, 376 U.S. 254 (1964)?

(2) If not, was negligent publication by Cox and the newspaper subsumed in the jury's finding of a publication with reckless disregard for the truth; and, if so, was the evidence in this case sufficient to support a finding of negligent publication?

(3) Was the evidence in this case sufficiently clear and convincing to support the jury's finding of publication by Cox with a reckless disregard for the truth, which Lipscomb must establish to recover punitive damages?

Collateral issues must also be resolved as to the admissibility of an expert's opinion on the standard of care, the obligation of a trial court to segregate potentially defamatory evidence from non-defamatory evidence in its instructions to the jury, and the size of the jury's verdict.

## II.  FACTS

The news article was in the Sunday newspaper a few weeks prior to the opening of school in the fall of 1981. The article iden-

tified Lipscomb by name and said that certain parents and their children:

> charge that a Thomas Jefferson High School teacher is disorganized, erratic, forgetful and unfair; that she returns graded papers weeks late and absents herself from the classroom for long periods; that she insists students stick to the rules, and flouts them herself. They say she demeans and humiliates students. The brighter they appear, the likelier they are to suffer at her hands, the parents protest.

One of Lipscomb's colleagues was quoted as saying that the teacher "might be out of her element in dealing with the students found in the honors course where most of the problems seem to have cropped up since the mid-1970's."

Dr. I. David Goldman, a physician and a teacher at the Medical College of Virginia and the father of one of Lipscomb's students, initiated the contact with Cox. Goldman allegedly told Cox that the school's principal "has had enough complaints about Ms. Lipscomb's performance over the years to know that there was trouble."

Another parent, a minister, was quoted as saying that his son was:

> so unreasonably and harshly treated [that the parent] told both [the teacher] and her principal that she ought to be ousted from the classroom . . . [that] he remembers Ms. Lipscomb as 'totally unbending, [a woman] of no leeway, no compromises, . . . [she] was willing to "settle for mediocrity" and conformity.' [The minister also was alleged to have] told the school superintendent . . . 'she is not fair, that she is hurting these kids.' I told [the superintendent] 'I will do all I can to get rid of her. She is bad for this system, bad for these kids.'

The article referred to a third parent as "[s]ound[ing] a note heard often: that Ms. Lipscomb is inclined to react in ways the students regard as irrational or harsh when her facts, judgment or authority are questioned. 'I think she has a bias against bright kids. Maybe she's afraid of them.'" A fourth parent described her child as one "with a long record of good grades [who] hits Ms. Lipscomb's class and winds up with a 'D.'"

The article quoted a student as saying, "She [Ms. Lipscomb] was patronizing, she was late for class, and she was missing from class a third of the time. When she was present she was so disorganized that few if any of [my] classmates understood what was expected of them. She didn't teach, I really learned nothing . . . her verbal excesses . . . caused . . . pain, I cried in class, I cried outside her class." Another student was quoted as saying she was a victim of the teacher's harassment tactics, "[i]f I asked her a question, she would come back with something like, 'That's a stupid question.'" Dr. Goldman's daughter allegedly told the reporter that, "[Ms. Lipscomb] seemed to hate what I represented, meaning middle-class, bright, articulate, assertive, questioning . . . I questioned her grades, I questioned her before the others in the class. She really didn't like it [and] she was always chipping away at our self-confidence."

A final student quoted said that the teacher's:

> verbal excess made me bawl right there in class, not once but twice. [Lipscomb's] students in the past year were always unsettled about what she would do next. She is just not a teacher. She would assign a test and we'd sit up half the night studying. When we got there in the morning, she'd say we won't take it. No reason. Or she'd just forget assigning us a test. She lost papers we turned in. She's totally unfitted to be in that class.

The negative comments essentially were repeated in the trial testimony of the individuals quoted. On the other hand, a number of students, teachers, and school administrators contradicted those complaints.

Cox essentially confined his investigative activities to interviews with the complaining parents and students and to telephone conferences with Lipscomb's principal and two of Lipscomb's teaching colleagues. He obtained very little information from Lipscomb and the other school employees. The school board's attorney had advised Lipscomb and certain school administrative officials not to discuss the details of the Goldman complaints because of the law dealing with confidentiality of both student and individual teacher records and his fear of litigation over the Goldman issue with Lipscomb as a possible defendant.

### III. WHETHER LIPSCOMB WAS
### A NEW YORK TIMES "PUBLIC OFFICIAL"

We first consider whether the trial court correctly required Lipscomb to prove publication with a reckless disregard for the truth in her claim for compensatory damages. The answer to this question hinges upon whether the trial court properly classified Lipscomb as a "public official" under the *New York Times* malice rule.

■ *New York Times* prohibits "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80. "Actual malice" as described in *New York Times* might be confused with common law malice, which involves "motives of personal spite, or ill-will." *The Gazette* v. *Harris*, 229 Va. 1, 18, 325 S.E.2d 713, 727, *cert. denied sub nom. Fleming* v. *Moore*, 472 U.S. 1032 (1985); *Story* v. *Newspapers, Inc.*, 202 Va. 588, 590, 118 S.E.2d 668, 670 (1961). Therefore, we will refer to such actual malice as *"New York Times"* malice.

■ The Supreme Court said in *New York Times* v. *Sullivan* "[w]e have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule." 376 U.S. at 283 n.23. In *Hutchinson* v. *Proximire*, 443 U.S. 111, 119 n.8 (1979), the Supreme Court pointed out that it "has not provided precise boundaries for the category of 'public official'; it cannot be thought to include all public employees, however." Nevertheless, that Court has left little doubt that other courts are to determine who is a "public official" in accordance with "the purposes of a national constitutional protection," *Rosenblatt* v. *Baer*, 383 U.S. 75, 84 (1966), and not by reference to state law standards.

The following United States Supreme Court cases give some guidance. In *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court observed that:

> The first remedy of any victim of defamation is self-help — using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials . . . usually enjoy significantly greater access to the channels of effective communication

and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

*Id.* at 344 (footnote omitted). The *Gertz* Court accorded private person status to an attorney who was not on the public payroll. *Id.* at 352. Although Lipscomb was on the public payroll, we believe attorneys have significantly more access than teachers to the media and a more realistic opportunity to answer false charges about their competence. We must also keep in mind that Lipscomb probably could not have answered these charges fully without disclosing other students' names and records in violation of Code § 22.1-287 (1980).[1]

■ *Gertz* also noted that "[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case." 418 U.S. at 344. However, that is only one of the many matters a court must weigh in deciding whether a particular public employee is one classified as a "public official" under the *New York Times* malice rule.[2]

■ Other United States Supreme Court cases give further guidance by identifying and weighing the conflicting interests to be served. *Rosenblatt* suggested:

The motivating force for the decision in *New York Times* was twofold . . . first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues . . . . [I]t is clear, therefore, that

---

[1] Code § 22.1-287 provides in pertinent part:
No teacher, principal or employee of any public school nor any school board member shall permit access to any written records concerning any particular pupil enrolled in the school in any class to any person except under judicial process . . . .
This provision is subject to a number of exceptions not applicable here.

[2] We quoted *Gertz* in support of our finding that a college professor on the state payroll was not a public figure in *Fleming v. Moore*, 221 Va. 884, 891-92, 275 S.E.2d 632, 637 (1982), *cert. denied*, 472 U.S. 1032 (1985). However, different considerations determine whether a person is a "public figure" or a "public official" under the *New York Times* malice rule.

the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

Where a position in government has such apparent importance that the public has an independent interest in the qualifications and importance of the person who holds it, beyond the general public interest in the qualifications and importance of all government employees, both elements we identified in *New York Times* are present . . . .

383 U.S. at 85-86.

■ Cases construing the "public official" standards of *New York Times* are legion, but we have found no federal cases concerning school teachers. The state defamation cases are split on the issue of whether public school teachers are "public officials" subject to the *New York Times* malice rule.[3]

■ There has been no showing that Lipscomb, who was not an elected official, either influenced or even appeared to influence or control any public affairs or school policy. On the contrary, the evidence shows her to have limited her activities to teaching and acting as a temporary department head of a small number of other English teachers. We also note there was no criticism of Lipscomb as an acting department head — it is all leveled at her teaching activities.

---

[3] The following cases lend support to the proposition that a public school teacher is a *New York Times* "public official." *See Sewell* v. *Brookbank*, 119 Ariz. 422, 425, 581 P.2d 267, 270 (1978); *Gallman* v. *Carnes*, 254 Ark. 987, 992, 497 S.W.2d 47, 50 (1973); *Basarich* v. *Rodeghero*, 24 Ill. App. 3d 889, 893, 321 N.E.2d 739, 742 (1974); *Luper* v. *Black Dispatch Publishing Company*, 675 P.2d 1028, 1030-31 (Okla. 1983); *Johnston* v. *Corinthian Television Corp.*, 583 P.2d 1101, 1103 (Okla. 1978). On the other hand, the following cases suggest that public school teachers are not *New York Times* "public officials." *Franklin* v. *Lodge 1108, Benevolent and Protective Order of Elks*, 97 Cal. App. 3d 915, 922-24, 159 Cal. Rptr. 131, 136-37 (1979); *Nodar* v. *Galbreath*, 462 So.2d 803, 808 (Fla. 1984); *McCutcheon* v. *Moran*, 99 Ill. App. 3d 421, 424, 425 N.E.2d 1130, 1133 (1981); *Johnson* v. *Board of Junior College Dist. No. 508*, 31 Ill. App. 3d 270, 276 n.1, 334 N.E.2d 442, 447 n.1 (1975); *True* v. *Ladner*, 513 A.2d 257, 263-64 (Me. 1986); *Milkovich* v. *News-Herald*, 15 Ohio St. 3d 292, 297, 473 N.E.2d 1191, 1195 (1984), *cert. denied, Lorain Journal Co.* v. *Milkovich*, 474 U.S. 953, *overruled, Scott* v. *News-Herald*, 25 Ohio St.3d 243, 296 N.E.2d 699 (1986); *Poe* v. *San Antonio Express News Corp.*, 590 S.W.2d 537, 540 (Tex. Civ. App. 1979).

■ Although the article purports to raise the general question of what redress parents of a public school student may have when faced with an allegedly incompetent teacher, it named only one allegedly incompetent teacher and charged specific instances of that teacher's incompetence. Redress through the school system was available to the parents to question individual teacher competence. When Cox and the newspaper chose to assist Dr. Goldman in going beyond his normal remedy by publicizing his dispute, they became subject to the same duty of due care to ascertain the accuracy of their charges that every citizen must assume when issuing statements, the substance of which makes substantial danger to reputation apparent.

The same reasoning applies to the defendants' contention that because the school system did not respond to Dr. Goldman's satisfaction, the conflict escalated into a public issue of evaluation of teacher competence in general and accountability of the school administration to the parents and students in particular. As *Rosenblatt* points out, "[t]he employee's *position* must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." 383 U.S. at 86 n.13 (emphasis added).

■ We find that the public had no independent interest in Lipscomb's qualifications and performance "beyond its general interest in the qualifications and performance of all government employees," and, therefore, conclude that Lipscomb was not a "public official" under *New York Times* but a private person. Accordingly, we decide that the trial court erred in requiring Lipscomb to prove *New York Times* malice before she could recover compensatory damages.

## IV. NEGLIGENT PUBLICATION

Because the jury found the plaintiff established *New York Times* malice, we must next consider whether we properly may enter a judgment for Lipscomb for compensatory damages or whether the case should be remanded for a new trial on that issue. Upon our request, the parties addressed that question in supplemental briefs filed subsequent to oral argument of the appeal. Two factors influence this determination; first, is a finding of negligence subsumed in a jury's finding of a reckless disregard for the

truth? Second, if so, is the evidence sufficient to support a finding that Cox's investigation was negligent?

We described recklessness as a high degree of negligence in *Griffin* v. *Shively*, 227 Va. 317, 321, 315 S.E.2d 210, 212 (1984). As *White* v. *Center*, 218 Iowa 1027, 1037, 254 N.W. 90, 95 (1934), expresses it, "[o]ne who is guilty of negligence may not be guilty of recklessness, but one who is guilty of recklessness is also guilty of negligence."

We have said, in discussing the survival of common-law qualified privileges in Virginia, that the negligence standard is subsumed in the higher standard of common-law malice. *The Gazette*, 229 Va. at 18, 325 S.E.2d at 724. And in *Great Coastal Express, Inc.* v. *Ellington*, 230 Va. 142, 152, 334 S.E.2d 846, 853 (1985), we found that the trial court improperly imposed the higher standard of *New York Times* malice upon a private person seeking to recover compensatory damages for defamation. In *Great Coastal Express*, we concluded the higher standard of *New York Times* malice subsumed the required negligence standard and held the lack of a negligence instruction was harmless.

This jury found that Cox acted with reckless disregard for the truth. The jury, and not the court, determines the factual issues of negligence. Therefore, if we find the evidence is sufficient to create a factual issue of Cox's negligence, we will apply the rationale of *Great Coastal Express* to this case.

Because the trial court did not submit the issue of negligent defamation to the jury, it did not make the required preliminary inquiry of whether "the substance of the defamatory statement 'makes substantial danger to reputation apparent.'" *See The Gazette*, 229 Va. at 11, 325 S.E.2d at 722. We do so now from the record as we did in *The Gazette*, 229 Va. at 28, 325 S.E.2d at 733. In this case the inquiry needs little discussion. All parties, including Cox and his editors, recognized a substantial danger of injury to Lipscomb's reputation, raising a duty to investigate the accuracy of the statements made to Cox.

A number of supervisors, a fellow teacher, and students, including some classmates of the complaining students, testified as to Lipscomb's good qualities as a teacher and contradicted virtually all the negative statements made by the persons Cox interviewed. The students who contradicted the negative testimony were all shown to have been readily available for interview in the Richmond area. While the school authorities would not furnish Cox

with the names or addresses of other students in Lipscomb's classes, the jury could have inferred from the evidence that Cox could have obtained this information from the students he interviewed but negligently failed to do so. In fact, one student gave Cox the names of some of the other students, but Cox apparently did nothing with the information.

We find that the jury had ample evidence from which to conclude that a reasonably prudent news reporter writing this article could readily have contacted a number of other students to verify (or contradict) these accusations and should have done so. Moreover, because there is no issue as to Cox's agency, the newspaper company also is liable for his negligent performance under familiar principles of *respondeat superior*.

## V. SUFFICIENCY OF THE EVIDENCE TO SHOW NEW YORK TIMES MALICE

The jury awarded punitive damages against Cox. To sustain that award, Lipscomb, as a private person, is required to establish *New York Times* malice by clear and convincing proof. *Newspaper Publishing Corp.* v. *Burke*, 216 Va. 800, 804, 224 S.E.2d 132, 136 (1976). To decide if that requirement has been met, we conduct an "independent examination of the whole record," *The Gazette*, 229 Va. at 19, 325 S.E.2d at 727, resolving disputed factual issues and inferences favorably to the plaintiff. Lipscomb maintains that Cox's reckless disregard for the truth is demonstrated by a consideration of the following six factors:[4]

(1) Lipscomb says that the ill will Cox's sources bore Lipscomb was of such a character as to raise obvious doubts as to their veracity. A review of the five cases Lipscomb cites in support of this contention demonstrates the insufficiencies of this argument.

The Supreme Court in *St. Amant* v. *Thompson*, 390 U.S. 727 (1968), suggested that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732. However, the Court in *St. Amant* concluded that, "[f]ailure to investigate does not in itself establish bad faith . . . [c]loser to the mark are considerations of [the informant's] reliability." *Id.* at 733. The Supreme Court then

---

[4] We express no opinion on the appropriateness of Lipscomb's six factors as tests for determining the presence of *New York Times* malice.

found against the claimant in *St. Amant* since there was no evidence of the informant's bad reputation for veracity.

In each of the remaining cases cited by Lipscomb, the reporter either had personal doubts about the informant or had been told that the informant was unreliable. *Pep* v. *Newsweek, Inc.*, 553 F.Supp. 1000, 1002 (S.D.N.Y. 1983); *Alioto* v. *Cowles Communications, Inc.*, 430 F.Supp. 1363, 1370-71 (N.D.Cal. 1977), *aff'd*, 623 F.2d 616 (9th Cir. 1980), *cert. denied*, 449 U.S. 1102 (1981); *Burns* v. *McGraw-Hill Broadcasting Company, Inc.*, 659 P.2d 1351, 1361-62 (Colo. 1983); *Stevens* v. *Sun Publishing Co.*, 270 S.C. 65, 71, 240 S.E.2d 812, 815, *cert. denied*, 436 U.S. 945 (1978).

Lipscomb cites no other United States Supreme Court cases that directly address the issue of ill will or bias affecting credibility. However, the case of *Hotchner* v. *Castillo-Puche*, 551 F.2d 910, *cert. denied sub nom. Hotchner* v. *Doubleday & Co., Inc.*, 434 U.S. 834 (1977), held that proof of ill will or bias on the part of an informant is not sufficient in itself to impute knowledge of probable falsity of the information. Another *New York Times* malice case, after reciting the obvious bias of the informants, including the ex-wife of the defamed plaintiff and the ex-husband of his present wife, concluded that this did not automatically disqualify them as legitimate sources of information. *Loeb* v. *New York Times Communication Corp.*, 497 F.Supp. 85, 92-93 n.12 (S.D.N.Y. 1980).

██ Except for the bias suggested by their expressions of dissatisfaction with Lipscomb, there is nothing to impeach the credibility of the professor of medicine, the minister, the Richmond school teacher, and the state health department employee, who were the complaining parents, or of their four complaining children. We conclude that there was insufficient damaging evidence about the informants themselves to provide obvious reasons to doubt their veracity.

(2) Lipscomb claims Cox's testimony demonstrates a predetermination of the facts. The most persuasive testimony we can find to support this assertion is Cox's testimony that when Dr. Goldman first called him:

> He said that he had a story he wanted to talk to me about. And he told me in general about the thing . . . . He indicated enough to pique my interest about the thing . . . .

[H]e had considerable documentation to present in this case, an extraordinary amount, obviously of documentation already built up in this case. There was a record there for the picking up. In other words . . . [h]e said that he thought it had a wide public interest. I thought so myself. I was impressed [by the long document Dr. Goldman had written the school board] and I made a lot of marks on this thing . . . I'm cautious by nature and I considered this document and I considered Dr. Goldman rather carefully. I was interested in the story. I had been thinking about such a story for a long time.

*Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 169 (1967) (Warren, C.J., concurring), and *Corabi* v. *Curtis Publishing Co.,* 441 Pa. 432, 466 n.20, 273 A.2d 899, 916 n. 20 (1971), relied upon by Lipscomb, described "programs" conducted by the publishers to arouse people. The *Butts* case contained evidence of "an editorial decision . . . to 'change the image' of the [magazine beginning with] an announcement that the magazine would embark upon a program of 'sophisticated muckraking,' designed to 'provoke people, make them mad.' " 388 U.S. at 169. The evidence in this case discloses no such program conducted by the defendants; it is essentially limited to a criticism of their handling of this particular article.

██ Lipscomb refers to three cases in support of her claim that Cox had "predetermined the facts" when he began writing the story and suppressed favorable evidence to achieve that end. A review of the facts in those cases illustrates the failure of Lipscomb's proof on this point.

In *Gertz* v. *Robert Welch, Inc.,* 680 F.2d 527, 539 (7th Cir. 1982), *cert. denied,* 459 U.S. 1226 (1983),[5] the court said:

In summary, [the editor] conceived of a story line; solicited . . . a writer with a known and unreasonable propensity to label persons or organizations as Communist, to write the article; and after the article was submitted, made virtually no effort to check the validity of statements that were defama-

---

[5] This case was on appeal from the trial court to which it had been remanded by the earlier decision of *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974).

tory *per se* of [the plaintiff], and in fact added further defamatory material based on [the writer's] 'facts.'

In *Goldwater* v. *Ginzburg*, 414 F.2d 324 (2d Cir.), *cert. denied*, 396 U.S. 1049 (1969), the reporter, before beginning any research, solicited comments from Walter Reuther about Senator Goldwater, who had recently won the Republican nomination for the presidency. The solicitation stated in part:

> 'I'm writing an article for [the magazine] about an old enemy of yours — Barry Goldwater. It's going to be a psychological profile, and will say, basically, that Goldwater is so belligerent, suspicious, hot-tempered, and rigid because he has deep-seated doubts about his masculinity.'

414 F.2d at 329.

In *Airlie Foundation, Inc.* v. *Evening Star Newspaper Co.*, 337 F.Supp. 421 (D.C. Cir. 1972), the reporter who wrote the defamatory story from a press release of defamatory information added his own defamatory information, also determined to be false. The evidence in this case falls far short of that necessary to establish the "predetermination of the facts" referred to in these cases.

(3) Lipscomb argues that Cox not only resolved ambiguities in the story against her but actually omitted information that was favorable. Cox did fail to report that a substantial part of Lipscomb's extended absence from class was due to the death of her fiance, resulting in a leave of absence, which Lipscomb characterizes as a "brutal twisting of known facts." The omission of this favorable explanation for her absence may have been unfair, but we do not agree that it sufficiently evidenced either the "brutal twisting" claimed or a reckless disregard for the truth.

Lipscomb further accuses Cox of "consistently refusing to include [favorable] information which contradicted the predetermined thesis of the article." She refers only to the information Cox received from her school principal, the school board attorney, and two fellow teachers concerning her excellent qualities as a teacher and her "unblemished record," and then charges that "[yet] nowhere in the article do these quotes appear."

Examination of the record reveals *no* testimony from the school principal that he told Cox that Lipscomb was an "excellent teacher with an unblemished record," as Lipscomb claims in her brief, but we note that Cox quoted him in the article as saying

that she "was so highly thought of that she was promoted to department head in the past year." The school board's attorney told Cox, "There were people I had talked to that thought she was a good teacher"; the article says "school authorities assert that she is a good teacher."

One of Lipscomb's colleagues testified that she told Cox that Lipscomb was "a good teacher of grammar" and "I thought she was a good teacher" and perhaps she also said that Lipscomb "was a strict disciplinarian." Another teacher was quoted as telling Cox that Lipscomb was a "good teacher of grammar," but this teacher did not testify. The only omission we find is the failure to attribute the appraisal of Lipscomb "as a good teacher" to her fellow teachers, but that laudatory comment could be considered as having come "from school authorities."

Our review of the evidence convinces us that there is insufficient support for this claim.

(4) Lipscomb contends that the absence of deadline pressure "holds a libel defendant more accountable." While the cases cited by the plaintiff indicate that lack of a deadline is a factor to be considered, in each case there also was other evidence of conduct demonstrating a reckless disregard for truth. *See Butts*, 388 U.S. at 157; *Carson* v. *Allied News Co.*, 529 F.2d 206, 211 (7th Cir. 1976); *Goldwater*, 414 F.2d at 339; *Burns*, 659 P.2d at 1362 (Colo. 1983); *Mahnke* v. *Northwest Publications*, 280 Minn. 328, 340, 160 N.W.2d 1, 12 (1968).

The facts in all those cases give rise to an inference of recklessness in failing to check other sources, apart from deadline pressures. Lipscomb cites no cases, however, where absence of deadline pressure, coupled with a biased source, was sufficient to establish *New York Times* malice.

Indeed, *Tavoulareas* v. *Piro*, 817 F.2d 762, 797 (D.C. Cir. 1971), is to the contrary: "[T]he absence of deadline pressure is probative of nothing," supporting that statement with this footnote: "Absence of deadline pressure has been found relevant in actual malice inquiries only to negate defendants' excuses for inadequate investigation of their stories . . . . No such situation is presented here." 817 F.2d at 797 n. 52 (citation omitted). Notably, the *Tavoulareas* informant was a biased source — the plaintiff's estranged son-in-law. If the evidence available to Cox at the time of writing was legally insufficient to require a further investi-

gation before publication, additional time to do such an investigation has no legal significance.

(5) Doubts of the newspaper staff members as to the accuracy of the story were said to be evidenced by their delay in publishing it until Cox returned from a vacation. Cox testified that upon his return his editors had fears and reservations because "[T]hey just wanted to be careful journalists. They wanted to be very, very sure of the sources on this . . . they wanted their hands held, to be reassured I had done all my work, as an employee, and I was able to tell them, I assume convincingly, that I had done my work, [they] wanted to be sure that what [I] had gotten was accurate and the sources were reliable." This is hardly "sufficient evidence to permit the conclusion that [either of] the defendant[s] in fact entertained serious [doubt] as to the truth of his publication." *St. Amant*, 391 U.S. at 731; *cf. Tavoulareas*, 817 F.2d at 793-94 (an editor's statement, "[i]t's impossible to believe" that the plaintiff set up his son in business in derogation of his fiduciary duty, coupled with a biased source, may have sufficed to show a reckless disregard for the truth if it had referred to a false statement; however, the court found the statement was essentially true).

(6) The evidence is insufficient to support Lipscomb's final charge that Cox threatened and intimidated her, the school board's attorney, and the principal, the only favorable sources cited by her. On the contrary, the evidence shows that Cox was trying to persuade them to give Lipscomb's side of the controversy.

The school board's attorney testified that Cox told him if "the school system did not make a formal response to this situation, that the article was going to be written and it was going to not look good for the school system or Ms. Lipscomb . . . he was going to write a story and it was not going to reflect on the school system or Ms. Lipscomb because the implication was the School Board would not respond to that."

Lipscomb, when asked if Cox had said, "you really ought to respond to the charges or words to that effect" replied, "Words to that effect, but it was more or less like an intimidating thing, like 'you'd better talk to me.' He didn't say, 'You ought to talk to me.' It was more or less an intimidation thing . . . I just could detect something like a threat in his voice." Cox himself said, "I tried, I tried very hard to tell [Lipscomb] that these were serious charges. And it seemed to me that she ought to respond."

The school principal testified that when he refused to give his views about Lipscomb in connection with the Goldman complaints, Cox "indicated the article would be written with or without my comments, which didn't set too well with me either . . . he was going to write it with or without my input. He was trying to get my side along with whatever information he had."

██ We conclude that, even with the bias shown, no one of the six elements charged is legally sufficient to justify a jury's finding of a reckless disregard for the truth. We equally are convinced that a consideration of all these elements as a group demonstrates the same inadequacy. Although we are satisfied that the evidence was sufficient to create a factual issue of negligence, as stated above, we find it insufficient to establish *New York Times* malice by clear and convincing evidence. Accordingly, we will reverse the award of punitive damages against Cox.

Lipscomb assigned cross-error to the trial court's refusal to submit the issue of the newspaper's liability for punitive damages to the jury. We need not decide that issue in view of the preceding discussion.

## VI. ADMISSIBILITY OF EXPERT WITNESS TESTIMONY

The defendants contend that the trial court erred in excluding evidence from an expert witness, a nationally known journalist, proffered on the standards for investigative reporting. The excluded evidence was an opinion that Cox:

> followed the precepts of fair play and accuracy throughout this and did all of the things that a person should do, that is he took the accusation against the public figure and the public institutions and pursued them to obtain documentation and to also go to the individuals involved and give them every opportunity to explain their side of the accusations [and therefore did not depart] from the standards of journalism relating to investigative reporting.

The standards were described by the witness as:

> developed over a period of years and involve basic accuracy and fairness in articles and the mechanical procedures that

will result in accuracy and fair play for all of the people in the stories.

From that standpoint what one usually starts with is a brief accusation or criticism of a public official, and then you try to make a determination whether there is corroboration for that, use of public records, the use of a wide range of other devices and, in the end, go to those who will be criticized and ask those individuals what their response is to the criticism.

■ We conclude that the trial court did not err in excluding this evidence for a number of reasons.

First, the issue before the jury was a simple one, essentially whether Cox should have conducted further interviews with other students and parents to meet the standard of due care and to avoid acting with reckless disregard for the truth. *Coppola* v. *Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied*, 444 U.S. 1103 (1980), states the rule:

[E]xpert testimony concerning matters of common knowledge or matters as to which the jury are as competent to form an opinion as the witness is inadmissible. Where the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom, the opinion of an expert based upon such facts and circumstances is inadmissible.

*Id.* at 252, 257 S.E.2d at 803-04. An annotation on this subject includes the three cases cited by the defendants. Annot. 37 A.L.R.4th 987 (1985). It suffices to say that many more cases discussed in this annotation reach the contrary conclusion. In virtually all these cases the issue turned on how much investigation the reporter should have made before publishing a statement which subsequently turned out to be false, and most of the courts held that a jury was just as capable as an expert of deciding whether the reporter was negligent in failing to make further inquiry. We find that a jury in this state is as competent as any expert to form an intelligent and accurate opinion as to whether a reporter should have conducted additional investigations.

■ Second, the defense proffered this evidence in an effort to establish a "journalistic malpractice test." We think the adoption

of a "journalistic malpractice test" would be inappropriate for a number of reasons:

(a) While responsible newspapers serve many worthwhile objectives, profit is an important consideration. Startling, sensational stories tend to sell more newspapers than dull, factual stories. Thus, there is an inherent conflict of interest when a journalist is required to draw inferences from news items. It seems imprudent to permit media experts to set a standard under these circumstances.

(b) The evidence here does not establish that journalists are required to have special education for their profession,[6] as engineers, doctors, lawyers, or certified public accountants must, nor have they acquired knowledge, training, and experience unique to certain trades focusing upon scientific matters, such as electricity, blasting and the like, which a jury could not understand without expert assistance.

(c) The adoption of such a standard might mean that there could be no recovery unless a media expert testified that the conduct did not meet the standard of care in the journalistic community. *See Martin*, 549 P.2d at 92. We decline to impose such a requirement.

## VII. SEGREGATION OF POTENTIALLY DEFAMATORY MATERIAL FROM MATERIAL OBVIOUSLY NOT DEFAMATORY

Both parties agreed that the jury should see the entire article to determine the context of the particular defamatory statements. However, Cox contends the court should have winnowed out obviously nondefamatory material in its instructions to the jury.

There are two independent reasons why we find this contention has no merit:

(1) We assume the jury followed the trial court's instructions limiting Lipscomb's right of recovery to defamatory statements of fact.[7] The article contained not only potentially defamatory statements but also statements of opinions, laden with factual

---

[6] We note that Cox admitted he took no undergraduate courses in journalism. He received his college degree in economics.

[7] No party tendered an instruction informing the jury that it could not award damages for expressions of opinion nor were instructions tendered setting forth how statements of opinion could be distinguished from statements of fact.

content.[8] It was the jury's function to determine which statements were defamatory statements of fact about Lipscomb, taking into consideration the entire background of the case and the context in which those statements were made. *See Zayre, Inc.* v. *Gowdy*, 207 Va. 47, 50, 147 S.E.2d 710, 713 (1966); *Powell* v. *Young*, 151 Va. 985, 994, 144 S.E. 624, 626 (1928).

(2) There is no duty upon a trial court to segregate potentially defamatory from nondefamatory material in granting instructions to the jury. *See Harvey* v. *Epes*, 53 Va. (12 Gratt.) 153, 184-85 (1855). In *Harvey* a general motion was made to exclude all parol evidence tending to alter, vary, explain, or add to a written contract between the parties but the trial court refused to do so. On appeal, this Court said:

> [S]ome of the parol evidence was certainly admissible, and therefore it would have been improper to have excluded all. It would have been just as improper to have instructed the jury in general terms to disregard all parol evidence tending to alter, vary, explain or add to the written contracts mentioned in the said bill of exceptions. Nor was the court bound to sift the mass of evidence in the case, and determine which would alter, vary, explain or add to the written contracts, and which would not. It was the duty of the parties moving the instruction to point out the particular evidence objected to; and not having done so, the court, on that ground, was justifiable [*sic*] in refusing to give the instruction.

*Id.*

## VIII.  ALLEGED EXCESSIVE DAMAGES

The defendants charge that the verdict for $1,000,000 in compensatory damages and $45,000 in punitive damages was the re-

---

[8] Many of the potentially defamatory statements about Lipscomb were intermingled with what were arguably statements of opinion. However, the jury could consider those opinions as "laden with factual content." *See Ollman* v. *Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984), *cert. denied*, 471 U.S. 1127 (1985); *cf. Chaves* v. *Johnson*, 230 Va. 112, 118-19, 335 S.E.2d 97, 101-02 (1985). It is this feature which distinguishes this case from *Ollman* and *Chaves*. In *Ollman* the majority found the article was confined to statements of opinion that primarily depicted Ollman as a political activist and questioned his intentions as a potential head of a political science department of a college. 750 F.2d at 990-91. Similarly, in *Chaves* one architect merely characterized a competing architect as inexperienced and as charging excessive fees. 230 Va. at 118-19, 335 S.E.2d at 101.

sult of "passion, prejudice, or a misconception of the law" and that the verdict, therefore, should have been set aside in its entirety.

First, they argue that racial prejudice influenced the size of the verdict. Before the trial began, the trial court recognized that racial considerations *might* influence the outcome. However, after the trial ended, the court found that those considerations had not influenced the outcome, made a written finding that the jury had shown no "bias or improper motive in making its decision," and refused to set aside the compensatory damage verdict on that ground. Our review of the record demonstrates that the trial court did not abuse its discretion in making this finding.

Second, the defendants contend that the size of the verdict establishes that prejudice, passion, or a misconception of the law influenced both the amount awarded and the jury's determination of liability. While we have found the evidence insufficient to show a reckless disregard for the truth by Cox, it is more than ample to justify a finding of negligence in his failure to interview other students and school officials before publishing manifestly damaging statements about Lipscomb. Additionally, the trial court failed to find those factors which might indicate that an excessive damage award tainted the finding of liability.

This case is unlike *Rutherford* v. *Zearfoss*, 221 Va. 685, 272 S.E.2d 225 (1980), where the trial court expressly found that sympathy for the plaintiff influenced the finding of liability in a medical malpractice claim. Nor is this case like *Rome* v. *Kelly Springfield Tire Co.*, 217 Va. 943, 948, 234 S.E.2d 277, 281 (1977), where there was no clear preponderance of the evidence in favor of either party and the damage award was in the exact amount of the lost wages and medical expenses despite the plaintiff's serious and permanent injuries, suggesting that doubt about the liability issue materially influenced the jury.

The defendants cite *Ford Motor Co.* v. *Bartholomew*, 224 Va. 421, 297 S.E.2d 675 (1982), but the decision actually supports the action taken by the trial court in this case. There, the jury returned a plaintiff's verdict for $50,000. The defendant moved the trial court to set the verdict aside and order a new trial on all issues, contending that the verdict was so excessive as to demonstrate the jury had misunderstood the facts and the law. The court refused to set the verdict aside, holding "there is no reason to conclude that an excessive damage award tainted the legitimacy of

the jury's finding on liability." *Id.* at 434-35, 297 S.E.2d at 682. The court did order the plaintiff to remit $33,500 of the award, to which action the plaintiff assigned cross-error. We affirmed across the board. We cannot find in the present case that the trial court abused its discretion in concluding that the jury's finding of liability was not tainted by the excessive award of damages.

The defendants also complain that the size of the final awards — $100,000 in compensatory damages and $45,000 in punitive damages — was "so out of proportion to the damage sustained as to be excessive as a matter of law." We need not consider further the punitive damage award since we have set it aside.

■ Cox compares this case to *The Gazette*, where we set aside a jury's award of $100,000 for compensatory damages for defamation, finding it to be excessive as a matter of law. 229 Va. at 48, 325 S.E.2d at 745. Unlike the defamed plaintiff in *The Gazette*, Lipscomb was substantially and adversely affected by this defamatory publication.

The minister in her church said that she was "totally destroyed and distraught, was withdrawn and afraid . . . she was not the self-confident and assured . . . person she had been." He also said, "She has found it difficult to even attend the worship services let alone participate in the church services [as she formerly did]." Her supervisor at work says she has changed from a "proud, confident person" to one who avoids crowds, does not mingle with people, "has like crawled into a little shell, lost faith in almost anything and everything."

Lipscomb herself said she was unable to read the article without crying, she felt her whole career and life had been destroyed. Lipscomb says she now is very ill at ease in crowds, never knows what people are thinking, and "forever live[s] in fear when I go to school and in the classroom that another Dr. Goldman . . . will crop up and flash that article in my face." We find that a jury could infer substantial emotional injury from this evidence.

■ We must necessarily accord the trial court a large measure of discretion in remitting excessive verdicts[9] because it saw and heard the witnesses while we are confined to the printed record. *Bassett Furniture* v. *McReynolds*, 216 Va. 897, 912-13, 224 S.E.2d 323, 332-33 (1976). We do not find from this record that

---

[9] We are not required to make an independent review of the award of compensatory damages in this defamation case. *The Gazette*, 229 Va. at 20, 325 S.E.2d at 728.

the trial judge plainly abused his discretion in setting aside the award of $1,000,000 in compensatory damages or in imposing a remittitur of $900,000 on that verdict. He carefully reviewed the evidence in a written opinion, considering "factors in evidence relevant to a reasoned evaluation of the damages incurred," *id.* at 912, 224 S.E.2d at 332, and we will not disturb that finding because "the recovery after remittitur bears a reasonable relation to the damages disclosed by the evidence." *Id.*

█ Lipscomb assigns cross-error to the reduction. We believe an award of $1,000,000 clearly would have been excessive. However, the evidence does not demonstrate that the trial court abused its discretion in reducing the award to $100,000.

For the reasons assigned, we will affirm the judgment of $100,000 for compensatory damages against both defendants, will reverse the judgment of $45,000 for punitive damages against Cox, and will enter a final judgment of $100,000 against both defendants.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*

STEPHENSON, J., concurring in part and dissenting in part.

I concur with the majority's holdings that (1) Lipscomb was not a public official, (2) punitive damages should be denied because the evidence is insufficient to support the jury's finding that Cox acted with "reckless disregard for the truth," and (3) the trial court properly excluded expert testimony.* However, I disagree with the majority's decision to enter final judgment in favor of Lipscomb on the basis of negligence. In my opinion, the majority's ruling on this point is logically flawed.

The majority relies upon *Great Coastal Express* v. *Ellington*, 230 Va. 142, 334 S.E.2d 846 (1985), as authority for the proposition that a finding of negligence is subsumed in a finding of reckless disregard for the truth. At trial, the plaintiff in *Great Coastal*

---

* I also agree that the trial court properly submitted the entire article to the jury because the statements of opinion contained in the article were "laden with factual content," *Ollman* v. *Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984), *cert. denied*, 471 U.S. 1127 (1985). I would make clear, however, that "[i]t is for the court, not the jury, to determine as a matter of law whether an allegedly libellous statement is one of fact or one of opinion." *Chaves* v. *Johnson*, 230 Va. 112, 119, 335 S.E.2d 97, 102 (1985).

was required to prove *New York Times* malice. On appeal, however, we held that the appropriate standard was negligence. We then pointed out that because plaintiff had *successfully proved* the higher standard, he had necessarily proved negligence. *Great Coastal* therefore is authority for the proposition that if a plaintiff proves reckless disregard for the truth, he also proves negligence.

*Great Coastal* cannot serve as authority for the majority's decision in this case, however, because Lipscomb *did not successfully prove* reckless disregard for the truth. It is one thing to say that proof of a higher standard includes proof of a lower standard. It is quite another thing to say that failure to prove a higher standard includes proof of a lower standard.

Once the majority decided that Lipscomb failed to prove reckless disregard for the truth, the jury's verdict became null and void. Nevertheless, the majority seizes upon this void verdict as the predicate for ruling, as a matter of law, that negligence was proved. In my opinion, the majority has invaded the province of the jury.

In a case of this complexity, we should permit a properly instructed jury to decide the issue of negligence. Accordingly, I would remand the case for a new trial.

THOMAS, J., joins, concurring in part and dissenting in part.