## CIRCUIT COURT OF THE CITY OF RICHMOND

David Lee Jones

v.

Montgomery Ward & Co., Inc.

March 15, 1989

Case No. LJ-2280-2

By JUDGE RANDALL G. JOHNSON

This case is before the court on Montgomery Ward's motion to set aside as excessive the jury verdict in favor of plaintiff and to enter final judgment in favor of Wards. In the alternative, Wards moves the court to set aside the jury's verdict and to order a new trial.

The facts established at trial, considered in the light most favorable to plaintiff,[1] are that in June, 1983, plaintiff, whose name is David Lee Jones, received a telephone call from an employee of Wards informing plaintiff that his account with Wards was delinquent. Plaintiff informed the Wards' employee that he was not the David L. Jones the Wards' employee was looking for, and that he, the plaintiff, had never had an account with Wards. By letter to plaintiff dated June 28, 1983, the Wards' employee acknowledged that plaintiff was not Wards' customer, David L. Jones, and apologized to plaintiff on behalf of Wards for any inconvenience caused.

---

[1] See, e.g., Dewald v. King, 233 Va. 140, 141, 354 S.E.2d 60 (1987).

In January, 1985, plaintiff was considering purchasing a parcel of real estate in Chesterfield County. He decided to apply for a $1,000 loan to make the down payment. His loan request was denied. In February, 1985, plaintiff and plaintiff's brother, upon starting a business to be operated by plaintiff's brother, applied for credit card merchant status; that is, a business which can accept credit card payments from customers. That application was also rejected, although six days later another application, this one in plaintiff's brother's name only, was approved. Plaintiff learned that both his personal loan request and the joint credit card merchant application were rejected because of an entry on his credit report, maintained by Credit Bureau, Inc., that he, the plaintiff, had a delinquent account with Wards.

The trial evidence also showed that as of July 1, 1983, after plaintiff received Wards' letter of apology, Credit Bureau, Inc.'s file on plaintiff contained no reference to a Ward's account or any data identifying plaintiff as Wards' customer, David L. Jones. As of May, 1984, however, plaintiff's file erroneously identified plaintiff as Wards' delinquent customer by listing the customer's address as a former address of plaintiff, and by containing an entry indicating that plaintiff had a delinquent account with Wards. While contested by Wards, the record clearly contains sufficient evidence, as will be discussed below, to support the jury's conclusion that Wards was responsible for the erroneous information contained in plaintiff's file. Based on that conclusion, the jury returned a verdict in favor of plaintiff and awarded compensatory damages of $150,000, the precise amount sought in the motion for judgment.[2]

## 1. Excessiveness of Jury's Verdict.

It is beyond question that the courts of this Commonwealth have a duty to uphold the sanctity of jury verdicts.

---

[2] While the motion for judgment also sought punitive damages, plaintiff's counsel conceded at the conclusion of plaintiff's case-in-chief that punitive damages were inappropriate, and the court granted Wards' motion to strike and entered partial summary judgment in favor of Wards on that question.

*Smithey v. Sinclair Refining Company*, 203 Va. 142, 145, 122 S.E.2d 872 (1961). The verdict of a jury, arrived at upon competent evidence and controlled by proper instructions, in an impartially conducted trial, has always been held to be inviolate against disturbance by the courts. *Id.* If the verdict merely appears to be large and more than the trial judge would have awarded had he been a member of the jury, it ought not be disturbed, for to do so, the judge must then do what he may not legally do, that is, substitute his judgment for that of the jury. *Id.*, 203 Va. at 146. This does not mean, however, that *every* jury verdict must be allowed to stand:

> But if it appears that the verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision, then it becomes the plain duty of the judge acting within his legal authority, to correct the injustice. *Id.*, *See also Rutherford v. Zearfoss*, 221 Va. 685, 689, 272 S.E.2d 225 (1980).

Applying these principles here, the court concludes that the jury's verdict is clearly excessive and cannot be allowed to stand.

As previously stated, plaintiff had two applications for credit rejected after November 5, 1984, as a result of the erroneous information in his credit file.[3] Neither of those rejections, however, caused plaintiff any financial harm. Indeed, plaintiff's counsel stipulated at trial that no claim was being made for "any economic loss as a result of the failure to purchase the property" for which the loan was to be a downpayment, nor for "any loss of profits from the denial of credit card merchant status."

---

[3] The parties stipulated that the applicable statute of limitations barred any claim which may have arisen prior to November 5, 1984.

Transcript at 4. In light of those stipulations, the jury was instructed that if they returned a verdict for plaintiff, damages were to be awarded only for "any insult to [plaintiff] including any pain, embarrassment, humiliation and mental suffering; and any injury to [plaintiff's] reputation. Thus, only these last-mentioned items were to be considered by the jury in determining the amount of plaintiff's damages. Those items do not justify an award of $150,000.

Again considering the evidence in the light most favorable to the plaintiff, it is true that plaintiff was embarrassed and humiliated when the two previously-mentioned credit applications were denied. It is also true that plaintiff experienced some emotional pain and mental suffering by those denials, as well as in his subsequent, and successful, attempts to again have the erroneous entries removed from his file. Both plaintiff and his wife testified that after those rejections, plaintiff was "upset and confused;" he was "constantly consumed with this;" it was like a "nightmare." Another witness testified that plaintiff was extremely distraught and that he was screaming and very upset. While these are all factors for which the jury could properly award damages, they do not support the amount of damages awarded.

In *Fleming v. Moore*, 229 Va. 1, 325 S.E.2d 713, *cert. denied*, 473 U.S. 905 (1985), the plaintiff, a university professor, sued for defamatory statements which suggested he was a racist, elitist and supremist. The defamatory statements were published in the university paper which had a circulation of approximately 15,000. The plaintiff testified at trial that the statements upset and humiliated him and that he felt he had suffered a terrible wrong. The Supreme Court reversed the trial court's denial of the defendant's motion to set aside a $100,000 verdict as excessive:

> We agree with the defendant that the amount of the award bears no relationship to the loss actually sustained by the plaintiff. Clearly, [plaintiff] suffered damage to his reputation, embarrassment, humiliation, and mental suffering from this defamatory publication made negligently. Nevertheless, the verdict of $100,000 is so

out of proportion to the damage sustained as to be excessive as a matter of law . . . . [Plaintiff] experienced no physical manifestation of any emotional distress. Moreover, he sought no medical attention for any condition resulting from the publication. 229 Va. at 48.[4]

Similarly, in *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 362 S.E.2d 32 (1987), the Supreme Court affirmed the trial court's remittitur of a $1,000,000 jury award for compensatory damages to $100,000. The plaintiff in *Lipscomb*, a teacher in the Richmond City public school system, alleged she was defamed in an article which appeared in a Sunday edition of the *Richmond Times-Dispatch*. The article accused her of being "disorganized, erratic, forgetful and unfair . . . . [S]he demeans and humiliates students . . ." and quoted a parent as saying, "I will do all I can to get rid of her. She is bad for this system, bad for these kids." 234 Va. at 28. The Supreme Court noted that plaintiff's evidence showed she was "substantially and adversely affected by the defamatory publication." *Id*. at 300. Plaintiff was described as "totally destroyed and distraught, was withdrawn and afraid." *Id*. Plaintiff's supervisor at work testified that she had changed from a "proud, confident person to one who avoids crowds, does not mingle with people, has like crawled into a little shell, lost faith in almost anything and everything." *Id*. Plaintiff herself testified that "she felt her whole career and life had been destroyed." *Id*. In affirming the trial court's setting aside the verdict, the Supreme Court observed that "the recovery after remittitur [$100,000] bears a reasonable relation to the damages disclosed by the evidence." *Id*. at 301.

While there obviously is no sliding scale of damage awards to which judges can refer in determining whether a jury's verdict is excessive, nor any magic formula which can be applied to the facts of a case to determine a proper award, this court is convinced that the conduct proved

---

[4] Plaintiff in the case at bar also experienced no physical manifestation of any emotional distress, nor did he seek medical attention for any condition resulting from Wards' conduct.

and the injuries suffered in the case at bar do not remotely approach the more egregious conduct and injuries found by the courts to have existed in *Fleming* and *Lipscomb.* Moreover, the particular facts of this case render the jury's verdict "so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision." *Smithey v. Sinclair Refining Company, supra,* 203 Va. at 146. In short, it shocks the court's conscience. Accordingly, it must be set aside.

## 2. *Motion for Entry of Judgment in Favor of Wards.*

Wards next argues that the jury's verdict is so excessive as to call into question its finding of liability. Moreover, Wards asks the court to re-examine the evidence and enter judgment for Wards. In *Ford Motor Co. v. Bartholomew,* 224 Va. 421, 297 S.E.2d 675 (1982), in discussing whether, after a jury's verdict is set aside as excessive, a new trial should be granted on all issues or on the issue of damages only, the Supreme Court stated:

> [W]hen the evidence does not preponderate in favor of either party and the damage award is so large that it appears to be solely the product of sympathy, the jury's finding on liability is impeached and the court should order a new trial on all issues.
>
> A trial *de novo* is not mandatory, however, when the monetary award, though out of proportion to the injuries suffered, is not so excessive as to compel the conclusion that the liability verdict was the product of sympathy for the plaintiff or bias against the defendant. In such case, if the evidence before the jury clearly supports its finding of liability, a trial judge has two options. He may put the plaintiff on terms to accept a remittitur in lieu of a new trial, Code § 8.01-383.1, or he may grant the defendant a new trial limited to damages, Code § 8.01-383, 224 Va. at 434 (citations omitted).

Here, the evidence presented to the jury showed that the erroneous entry in plaintiff's file was made sometime between July 1, 1983, and June 1, 1984. Such

an entry could only have occurred in one of three ways: (1) information placed in the file by a creditor with access to Credit Bureau, Inc.'s computer files; (2) "file maintenance" performed by Credit Bureau, Inc., or one of its affiliated credit reporting agencies; or (3) a "file merger." Considering these possibilities in reverse order, a "file merger" occurs when separate files on the same debtor are combined to create one file. In order for this to happen, some identifying information, such as social security number, address, telephone number, must be identical in the separate files. Since the only identifying information here was the erroneous former address listed for plaintiff, such merger could only have occurred *after* that erroneous information was supplied.[5] Moreover, an employee of Credit Bureau of Richmond testified that based upon his review of the files, a file merger did not cause the erroneous information to be placed in plaintiff's file.

"File maintenance" is performed by Credit Bureau, Inc., or one of its affiliated reporting agencies, such as Credit Bureau of Richmond, when a consumer disputes the accuracy of information. The Bureau validates the data before executing a requested change. Neither Credit Bureau of Richmond, which owned plaintiff's file, nor Credit Bureau of Baltimore, where the file was physically located, had any record of file maintenance performed on plaintiff's file between July 1, 1983, and June 1, 1984.

This leaves as the only way in which the erroneous information could have been placed in plaintiff's file the action of a creditor. The records showed that during the period in question, only three creditors "accessed" plaintiff's file: Wards, Signet Bank, and Barclays Financial Service. Signet and Barclays accessed the file because plaintiff had sought credit from them. Neither of those entities, however, had any knowledge of or information about the address erroneously placed in plaintiff's file, so it would have been impossible for them to have added such information to his file. On the other hand, Wards

---

[5] Separate files whose only identical information is the debtor's name will not be merged.

did have such information. In addition, one of Wards' employees testified that it is customary for creditors accessing credit reports to enter into the terminal both the current and former addresses of individuals to obtain as much information as possible, and that Wards adheres to that practice. Moreover, plaintiff testified without contradiction that Wards is the only entity which had ever associated him with the erroneous address in question. Thus, it was entirely reasonable for the jury to conclude, from the overwhelming circumstantial evidence presented, that the erroneous entry was made by Wards. The court will not disturb that finding.[6]

## 3. *Remittitur.*

Having concluded that the jury's verdict is excessive but that ample evidence exists to support the finding of liability, the court must now determine an appropriate award. Considering the injuries proved, particularly plaintiff's embarrassment, humiliation, pain, mental suffering, damage to his reputation, and inconvenience experienced in rectifying the problem, and guided by the principles enunciated in *Fleming* and *Lipscomb, supra,* the court believes that $25,000 is an adequate sum to fully compensate plaintiff for the harm caused by Wards' conduct. Accordingly, plaintiff will be required to remit $125,000 of the jury's award and accept final judgment in his favor for $25,000, plus his costs. If plaintiff does not remit such portion of the verdict, a new trial will be granted on the issue of damages.

---

[6] The court also rejects Wards' argument that the erroneous entry was not authorized or ratified by Wards. The evidence is uncontroverted that all entries into plaintiff's credit file by employees of Wards were done in the ordinary course of business and in the exercise of their employment duties. Wards cannot argue that such an entry was unauthorized merely because it was erroneous.