**CIRCUIT COURT OF THE CITY OF RICHMOND**

Philip Morris Co., Inc., et al.

v.

American Broadcasting Co., Inc., et al.

**Case No. LX-816-3**

BY JUDGE T. J. MARKOW

December 30, 1994

This matter came before the court on plaintiff's motion for relief from letters rogatory for subpoenas *duces tecum* served on nonparties, and nonparty motions for protective orders and additional relief from subpoenas *duces tecum* served on them by defendants, American Broadcasting Companies, Inc. (ABC), John Martin, and Walt Bogdanich, in the defamation action brought against them by Philip Morris Companies, Inc.

2

The facts of the underlying controversy are well known. Philip Morris brought a defamation suit against defendants in response to allegedly defamatory statements made on ABC news programs, specifically the February 28 and March 7, 1994, broadcasts of the news magazine, *Day One*. During these broadcasts defendants reported the tobacco industry, of which Philip Morris is the largest manufacturer, were artificially "spiking" and "fortifying" cigarettes with nicotine in order to maintain consumer demand for its product.

In the course of discovery, defendants had Letters Rogatory issued in various jurisdictions resulting in subpoenas *duces tecum* served on several nonparties, including RJR Nabisco Holdings Corporation, Loews Corporation, American Brands, Inc., Brown & Williamson Tobacco Corporation, Brooke Group, Ltd., The Tobacco Institute, and the Council for Tobacco Research. The aforementioned nonparties, who have petitioned this court for relief, contend the requests are overly broad and unduly burdensome. Defendants counter the scope of discovery is broad and that the requests are necessary to determine whether the statements made in the course of the broadcast were "substantially true," whether they acted with "actual malice," and whether their broadcasts were the proximate cause of Philip Morris' alleged damages. Philip Morris denies that it does any "spiking;" therefore, what other manufacturers do and/or know about the effects of nicotine is beyond the scope of discovery and is unduly burdensome. Similarly, the nonparties claim the discovery is unduly burdensome because of the breadth of the materials sought.

Therefore, the issue before this court is whether the discovery sought from these nonparties is unduly burdensome to constitute "good cause" under Virginia Supreme Court Rule 4:1(c) to preclude Defendant's requests.

Virginia Supreme Court Rule 4:1(c) provides in part, "Upon motion by a party or the person from whom discovery is sought, and for good cause shown . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the discovery not be had . . . ." The party seeking to preclude discovery bears the burden of showing "good cause" exists. *See Castle v. Jallah*, 142 F.R.D. 618 (E.D. Va. 1992).

"Good cause" depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the court. *Black's Law Dictionary* (6th ed.). The nonparties are confronted with

thirty-seven requests for production of documents. These requests span thirty-two years, covering a very detailed and broad range of topics, including: the pharmacological effects of nicotine (see Requests 13, 14, 15, 16, 17, 18, 20), nicotine substitutes or byproducts (see Requests 6, 9, 12), nicotine content in cigarettes (see Requests 4, 5, 7), cigarette manufacturing process (see Requests 30, 31, 32), tobacco substitutes and byproducts (see Requests 8, 9, 12), patents (see Request 25), research (see Requests 10, 19, 22, 23, 33, 34, 35, 37) and communications with each party in regard to the subject matter of the alleged defamatory publication, its content, and the present lawsuit (see Requests 1, 2, 3, 28). Based upon the scope of the controversy and the breadth of the requests, the court finds that compliance would be unduly burdensome to Philip Morris, as well as to each of the nonparties, thus "good cause" exists to preclude Defendant's requests.

Defendants argue pursuant to Virginia Supreme Court Rule 4:1(b)(1), that the discovery is not unduly burdensome taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. This court does not agree. In regard to the needs of the case, defendants contend the documents requested will lead to admissible evidence on the issues of "substantial truth" and "actual malice." These issues, however must be resolved in regard to Philip Morris alone, not the tobacco industry as a whole. This is not a "small-group defamation" case, where the allegedly defamed individual must prove his injury by showing he is a member of the group because he was never singled out with particularity. Here, the allegedly defamatory publication referred specifically to Philip Morris several times, including display of the company logo, quotes from Philip Morris executives taken from internal memoranda, and shots of cigarette brands manufactured by Philip Morris. The broadcast was "of and concerning" Philip Morris, because there was specific reference to it throughout the program, not because it is a member of the tobacco industry. Therefore, any affirmative defense offered, such as "substantial truth" must be proven only in regard to Philip Morris. For example, even if the allegations were true with regard to other cigarette manufacturers and false or made with reckless disregard for the truth in reference to Philip Morris, Defendants will not have carried their burden because this is not a "small group defamation" cause of action. Insofar as Philip Morris was included in the broadcast, Defendants are bound by the information they possessed

about Philip Morris at the time of the broadcast, not what they knew about or discover about other manufacturers.

A subpoena *duces tecum* should not be used when it is not intended to produce evidentiary materials, but is intended as a "fishing expedition" in the hope of uncovering information material to Defendant's case. *Farish v. Commonwealth*, 2 Va. App. 627, 630, 346 S.E.2d 736, 738 (1986). Based upon the parameters of this case, discovery from these nonparties would be little more than a "fishing expedition" by defendants hoping to find something that implicates Philip Morris. As such, any strain on their resources, irrespective of their annual revenues, is unduly burdensome and will not be allowed.

Finally, with regard to the amount in controversy and the importance of issues at stake, there is nothing that can be gained from these nonparties that will illuminate any issue that is in dispute. The amount in controversy is derived solely from the alleged harm to Philip Morris, not harm incurred by the entire tobacco industry as a result of the broadcasts. The public health and constitutional concerns implicated by the controversy will be fully explored in the context of the parties, not obscured by the industry information sought from the nonparties.

Accordingly, the subpoenas *duces tecum* are quashed. The requests for protective orders and additional relief by RJR Nabisco Holdings Corporation, Loews Corporation, American Brands, Inc., Brown & Williamson Tobacco Corporation, Brooke Group Ltd., The Tobacco Institute, and the Council for Tobacco Research are granted, as is Philip Morris Companies, Inc.'s motion for relief from letters rogatory.

### December 30, 1994

Before the court are several issues raised on demurrer and on discovery motions. While argued separately, the court is of the opinion that there are common issues which dispose of both the demurrer and most of the discovery issues raised in the Defendants' First Motion to Compel Plaintiff to Answer Interrogatories and to Produce Documents. Also decided here are issues raised on Plaintiffs' First Motion to Compel. While many issues are raised by each party, only those which are necessary for decision will be addressed. (There are multiple plaintiffs and defendants. For convenience, the plaintiffs will be referred to as Philip Morris and the defendants as ABC.)

## I. *Demurrer*

On demurrer, all material facts properly pleaded are taken as true if pleaded factually or if fairly implied or inferred from those alleged. A motion for judgment is sufficient if it informs the defendant of the nature and character of the claim. *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993), citing with approval *Rosillo v. Winters*, 235 Va. 268, 367 S.E.2d 717 (1988). Here, by agreement of the parties, not only is there to be examined the Amended Motion for Judgment, but also the transcripts and videotapes of the broadcasts of which Philip Morris complains.

This case arises from television broadcasts in which ABC claimed that Philip Morris and other cigarette manufacturers add nicotine to cigarettes for the purpose of addicting smokers. Philip Morris claims that the broadcasts imply the addition of "extraneous" nicotine in large quantities. It argues that such an allegation is false and that motive, i.e., to "hook" or addict smokers, is not an issue in this action.

ABC argues that an allegation of the addition of nicotine, in and of itself, is not defamatory, even if it were false. It contends that the "sting" of the broadcasts was not the addition of nicotine to cigarettes, but the motivation behind the addition.

The court finds itself in the most unusual position of disagreeing with both sides. That disagreement stems from the point at which the parties and the court begin their analysis of the issues on demurrer.

In Philip Morris' opposition to ABC's first requests for discovery which sought material related to Philip Morris' possible motives for the addition of nicotine, Philip Morris took the position that motive was irrelevant, as it did not add nicotine to its cigarettes. ABC says on demurrer, if that is your position we have not defamed you. The "guts" or the "sting" of our broadcast was not simply that you added nicotine but that you did it to "hook" smokers; therefore, your motive is what makes the addition of nicotine defamatory. The issue between the parties is drawn at the argument on discovery motion phase.

The court's starting point on both the demurrer and the discovery motion is, however, different. Rather than begin with the discovery motion, its analysis begins with the Amended Motion for Judgment. It is the pleading that must be analyzed to determine whether it states a cause of action and which defines the scope of discovery. Upon such review, there is no doubt that a cause of action for defamation is stated and that the issue of motive is raised.

Parenthetically, the court rejects ABC's notion that some higher scrutiny of pleadings is required where media defendants are involved. The same analysis of pleadings is afforded this group of defendants as is afforded any other. The issue, as cited at the beginning of this opinion, is whether ABC is apprised of the true nature of the claim asserted against it. *Cater-Corp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993).

The demurrer is premised upon the failure of Philip Morris to base its cause of action upon the falsity of the assertion that cigarette manufacturers intended to "hook" or addict smokers by the addition of nicotine. A review of the Amended Motion for Judgment, however, reveals that Philip Morris complains of precisely that, notwithstanding its protestations to the contrary. That is what is complained of in the ending of paragraph 7 of the Amended Motion for Judgment.

> But the frenzy whipped up by Day One is based on a totally false and defamatory premise made up of whole cloth: that Philip Morris intentionally adds extraneous nicotine to the tobacco used in its cigarette manufacturing process expressly in order to "hook" smokers. As detailed below, Philip Morris does no such thing.

So too in paragraph 8 of the Amended Motion for Judgment:

> That "secret" turned out to be the false and defamatory claim — knowingly and/or recklessly made by defendants — that Philip Morris (as well as other cigarette manufacturers) intentionally "spik[es]" and "fortif[ies]" its cigarettes with extra nicotine during the manufacturing process to keep smokers hooked.

After describing its process of utilizing "reconstituted" tobacco (stems and previously unusable tobacco leaf by-products) in paragraph 13, in paragraph 14 Philip Morris states:

> To claim that these processes constitute the "spiking" or "fortifying" of cigarettes with nicotine to "hook" smokers, to "keep people smoking" is an egregious falsehood.

The Amended Motion for Judgment must be viewed as a whole as the cited paragraphs should be viewed in context of the entire pleading — from the perspective of ABC's asking the question "What am I being called upon to defend?" So viewed, the court is of the opinion that Philip Morris complains that ABC defamed it by claiming that nicotine is added to cigarettes for the purpose of "hooking" or addicting smokers. That is a

serious charge. If false and made with knowledge of the falsity or with reckless disregard, i.e., "New York Times v. Sullivan malice," it is actionable defamation.

The premise for the demurrer is misplaced, i.e., Philip Morris has not pleaded enough. It only claims that they do not add nicotine. Philip Morris seems to agree that is what is pleaded. As the court has shown, however, that is not all that was pleaded. Philip Morris has pleaded that it does not "spike" cigarettes nor does it intend to "hook" smokers. ABC implicitly argues that if both are pleaded, a cause of action is stated. In any case, this court finds that a cause of action is stated and overrules the demurrer.

The court is also of the opinion that a cause of action is stated even if motive were not pleaded. An assertion that nicotine is added to cigarettes is serious. Nicotine is well known, or at least believed by a large segment of the public, to be associated with health problems. The program itself underscores the issue. If nicotine is not associated with health problems, "what's the big deal?" Certainly not that the manufacturers are trying to get smokers hooked to some benign or beneficial product. There would have been nothing newsworthy if nicotine did not have a negative connotation with the public.

While not pleaded that way, the court agrees with Philip Morris' argument that the allegation that it adds nicotine to cigarettes when it does not is in and of itself defamatory. Its situation is similar to this analogy: A well-known figure is reported to have severely beaten his pregnant "girlfriend" for the purpose of inducing her to miscarry. He responds, I have a girlfriend and yes, if she were pregnant that would be a severe problem to me that I wish would go away, but all that is really irrelevant, "I have never beaten her!" Would not the false report of the beating alone support a defamation claim? Of course it would. The motive for the beating might be relevant at trial to prove that there was a beating, but the false report of the beating itself would be actionable. Similarly, Philip Morris' assertion "that you falsely accused us of adding nicotine" is defamatory and actionable.

ABC also contends that allegations of "actual malice" are conclusory and are therefore inadequate as a matter of law. It admits that Philip Morris alleges "actual malice" as described in *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964). ABC claims, however, that Philip Morris asserts only bare conclusions of publishing a falsehood "knowingly and/or recklessly" and that these conclusions must be supported by facts. Conclusions alone are insufficient, but that is not all that is pleaded here.

Philip Morris alleges that ABC published and then republished the defamatory accusations after having been advised of their falsity. (See Amended Motion for Judgment paragraph 15.) In the Amended Motion for Judgment, Philip Morris also alleges the reconstitution process has been publicly known for years, yet ABC chose to characterize the process as "secret." Similarly, in paragraph 13 of the Amended Motion for Judgment, the use of denatured alcohol which ABC implied was for a sinister purpose was required by federal regulation.

Virginia is a notice pleading state. This pleading puts the ABC on sufficient notice of the claim made against it and is not deficient on the issue of malice.

Finally, ABC claims that the punitive damage claim for five billion dollars should be dismissed. It argues that ABC, a media entity reporting on public figures should not be punished for exercising free speech rights granted under the Virginia and the United States Constitutions because such punishment would chill speech about public figures.

There is no Virginia nor United States Supreme Court authority supporting the proposition that defamatory speech involving public figures, while subject to claims for compensatory damages under the very limited circumstances described in *New York Times v. Sullivan*, should not be subject to punishment by an award of punitive damages.

Under our constitutional system and in our culture, free speech is highly regarded and protected. As a free people, we must be able to learn what is going on so that we are able to act with knowledge and we expect to be able to express our views without fear of punishment. Most all would subscribe to this premise. What underlies the concept of free speech is the premise that *truth* will emerge and that free people need to know the truth in order to make decisions which concern them. Should free speech protection be based on the promotion of deceit, lies, and distortion the freedom would never have lasted as long as it has.

Notwithstanding the commitment to the truth, the Supreme Court in *New York Times v. Sullivan* held that even untruths would be published about public figures unless the publication were made maliciously. The holding attempts to assure free and robust discussion about public figures even to the point of permitting the publication of innocently made falsehoods.

ABC's argument that punitive damages would chill discussion about public figures is itself false. What punitive damages chill are maliciously made falsehoods against public figures. That is an entirely commendable

and laudable policy. There has never been articulated any constitutionally protected right to maliciously defame a public figure. It flies in the face of common sense that the courts should develop a policy which would fail to punish or even encourage the publication of malicious falsehoods. This court will certainly not do so.

ABC also complains that the punitive damage claim of five billion dollars exceeds the statutory cap of $350,000 and asks that the punitive damages *ad damnum* be reduced to $350,000. The statute does not permit the reduction. See Va. Code Ann. § 8.01-38.1. The clear meaning of the statute is that Philip Morris may request whatever it wishes and the jury may determine whatever it believes is appropriate, but the court may award no more than $350,000. There is no authority to limit the *ad damnum*.

The Demurrer will be overruled.

## II. *Defendants' First Motion to Compel*

In their first discovery requests, ABC sought material from Philip Morris and other tobacco manufacturers, trade associations, and related organizations. The material included research materials, patent information, etc., which might reflect on Philip Morris' motives in adding nicotine to its cigarettes. Philip Morris objected on the basis that motive was irrelevant. The nonparty recipients of the discovery requests claim undue burden. The objections of nonparties are dealt with in an accompanying opinion.

The parties have agreed that if the court will decide the issue of discoverability of material relating to motive, they will work out the details, many of which form the basis of other objections. Those issues will not be addressed unless the parties are unable to reach agreements among themselves.

Analysis of discoverability begins with the pleadings. The scope of discovery is described in part 4 of the Supreme Court Rules. Rule 4:1(b)(1) provides "Parties may obtain discovery regarding any matter, not privileged, *which is relevant to the subject matter involved in the pending action*." (Emphasis added.) The "subject matter" in the litigation is always framed by the pleadings.

Is material relating to the issue of motive "relevant to the subject matter involved in the pending action?"

Philip Morris argues that motive is not relevant, as it simply does not add "extraneous" nicotine.

From the pleadings and from the courts's review of the broadcast tapes and transcripts, the gist of the broadcast is that the "fortifying," "spiking," "manipulating" cigarettes with nicotine occurs in the production of reconstituted tobacco. The broadcast implies that nicotine which does not belong there; i.e., which is extraneous, is added to the tobacco so as to hook smokers. Philip Morris contends that all it does is replace some of the nicotine that was earlier removed.

In its Amended Motion for Judgment, Philip Morris describes the reconstitution process. The manufacturer removes materials from the plant products (leaf and stem parts), processes the plant parts and recombines the materials removed together with flavoring agents. (See Amended Motion for Judgment paragraph 13a, b, c.) Both Philip Morris and ABC acknowledge that the nicotine which is added back into the reconstituted tobacco is less than that found in the product originally. ABC's claim, however, that the reason to add any nicotine back is to "hook" the smoker.

Philip Morris' description of reconstituting tobacco undercuts its argument that "we simply do not add nicotine." It does add nicotine that could be left out. Why? Is it to make the product taste better; to assure that the customer gets what she pays for; or to addict the smoker so that more cigarettes are sold; or for some other reason?

If the purpose is benign, Philip Morris' wins. If to addict, it loses. Its motive in adding nicotine back to the reconstituted product is relevant to the case pleaded. ABC's First Motion to Compel will be sustained.

In regard to the discoverability of documents in Philip Morris' international offices, this court finds such matter is not discoverable. The broadcasts at issue pertained to Philip Morris' alleged manipulation of nicotine to "hook" the *American* consumer, allegations that could potentially lead to regulation of the tobacco industry by the United States Government. Any information regarding Philip Morris' international products, sales, etc., would be irrelevant. Therefore, ABC's motion to compel this type of discovery is precluded.

Additionally, the court is not persuaded that materials in the possession of a nonparty are discoverable solely because that entity is related to a party. Of course, if materials were transferred by Philip Morris to a related company, domestic or foreign, that should be discoverable. If not, companies could hide important matters behind some corporate veil. Absent such a finding, this court will not require discovery of materials held by a foreign related nonparty entity. So that there is no misunderstanding, the court is focusing on the separate corporate entity holding materials and not

on materials held by some division of one of the party corporate entities. That material is discoverable wherever it may be stored.

### III. *Plaintiffs' First Motion to Compel*

Philip Morris seeks the categories of information from ABC which Philip Morris describes as *first*, "documents relating to the severe ratings pressure suffered by ABC 's Day One show before the defamatory broadcasts were aired; and second, documents and materials in ABC's possession generally relating to cigarettes, tobacco and nicotine, including materials relating to ABC's prior news segments on those subjects."

These materials are relevant to Philip Morris' claim of actual malice. ABC has given some materials within the categories but say that the persons involved in the program(s) complained of have no knowledge of other materials. As actual malice must be proved, it must relate only to the knowledge of the persons involved in this program and not to the entire company. The court agrees with ABC's proposition that what is relevant to proving actual malice is what was known by those involved in the program(s) at issue. However, relevance is not the sole issue in determining the scope of discovery. Matter is also discoverable if it appears "reasonably calculated to lead to the discovery of admissible evidence." See Supreme Court Rule 4:1(b)(1).

For example, while there may be matter in ABC's files which might contradict information broadcast by the reporters and others preparing the story, it is not attributable to them to prove actual malice, unless they actually had knowledge of the materials. (See *New York Times v. Sullivan*, 376 U.S. 254, 287 (1964).) However, if Philip Morris were to discover the file matter, it could inquire of the reporters and producers their extent of knowledge of that material and thus possibly prove actual knowledge of the falsity of the matter they broadcast.

So, too, materials relating to ratings *may* lead to information tending to prove malice. In each instance, the court believes the material to be reasonably calculated to lead to the discovery of admissible evidence.

The court is of the opinion that the ABC's objection to the two categories of information described in Plaintiffs' First Motion to Compel is incorrect, and the Motion to Compel is sustained.

A copy of an order overruling the demurrer and sustaining Philip Morris' First Motion to Compel is enclosed. Counsel should prepare a sketch of an order implementing the court's decision regarding Defendants' First

Motion to Compel Plaintiffs to Answer Interrogatories and to Produce Documents. Should there be disagreement, each should submit a sketch.

### January 26, 1995

This matter came before the court on January 6, 1995, upon Defendant ABC's Motion to Quash Letters Rogatory and subpoenas *duces tecum* served on nonparties and Philip Morris' Motion to Compel ABC to identify their confidential sources and disclose their communications with and about such sources. The Motion to Quash is joined by several members of the television and printed press as *amici curiae*. Because the motions implicate similar issues and policy considerations, the court will deal with both in the same opinion.

The facts of the underlying controversy are well known. Philip Morris brought a defamation suit against ABC in response to allegedly defamatory statements made on ABC news programs, specifically the February 28 and March 7, 1994, broadcasts of the news magazine, *Day One*. During the course of discovery, ABC identified four confidential sources contacted during its investigation of the tobacco industry: "Deep Cough," a former R. J. Reynolds employee, a former Philip Morris employee, and two U.S. government employees. Invoking the reporter's privilege against disclosure of confidential sources, ABC refuses to identify these sources or to supply any information that may reveal their identities. Philip Morris has moved the court to compel disclosure of this information on the ground that there is no reporter's privilege in public figure defamation actions where the reporter is a party. Alternatively, Philip Morris argues that any privilege which may exist is qualified and must yield when balanced against a public figure plaintiff's burden of proving "actual malice."

Philip Morris has also caused Letters Rogatory to be issued in various jurisdictions resulting in subpoenas *duces tecum* served on several nonparties. The challenged subpoenas *duces tecum* are those served on American Express, Citibank, USAir, United Airlines, Continental Airlines, Hertz Corporation, Adam's Mark Hotel, AT&T, Cellular One, Bell Atlantic, MCI, Sprint, and NYNEX. Philip Morris' purpose in seeking discovery from these nonparties, to which ABC objects, is to trace the movements of Defendants in the course of their investigation in the hope of identifying their confidential sources. ABC moves to quash, contending that such discovery from disinterested nonparties is tantamount to asking the reporter directly because he must use the telephone, travel, and charge items to effectively investigate and maintain confidentiality, therefore the dis-

covery should be precluded according to the reporter's privilege against disclosure of confidential sources.

The issues and arguments presented are ones of first impression. The threshold question, is whether there is a reporter's privilege against disclosure of confidential sources in public figure defamation cases where the reporter is a party to the dispute. If there is not, then the Motion to Compel Disclosure must be granted and the court need not reach the issues implicated by the Motion to Quash the travel and telephone materials.

Philip Morris argues, relying on the U.S. Supreme Court's holding in *Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635 (1979), that there is no constitutional protection for a defendant reporter who refuses to identify sources used in a public figure defamation case. They contend that the Court struck a "careful constitutional balance" in *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964), by creating the "actual malice standard." By increasing the burden of proof on public figure plaintiffs in defamation cases, the Court enhanced First Amendment freedoms, thereby affording the press greater protection. Therefore, they argue, this balance should not be disturbed by granting the press additional protection of a reporter's privilege against disclosure of confidential sources.

Philip Morris' reliance on *Herbert* is misplaced. *Herbert* dealt specifically with whether there existed a privilege under the First Amendment to protect defendants in public figure defamation cases from inquiry into the editorial process and the state of mind of those who edit, produce, or publish. In refusing to recognize an "editorial process privilege" the Court said "according an absolute privilege to the editorial process of a media defendant in a libel case is not required, authorized, or presaged by our prior cases, and would substantially enhance the burden of proving actual malice, contrary to the expectations of *New York Times* . . . ." 441 U.S. at 169, 99 S. Ct. at 1645.

The "editorial process privilege" refused in *Herbert* is wholly different from the reporter's privilege against disclosure of confidential sources. The former is one that would shield from discovery the reporter's state of mind, which constitutes the essence of a showing of "actual malice;" the latter shields from discovery a human being who constitutes the source of the story, a qualified privilege already recognized by the Court prior to *Herbert* in *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646 (1972).

In *Branzburg*, the Court held there was no testimonial privilege, akin to that enjoyed under the Fifth Amendment, which would allow a reporter to refuse to appear before a grand jury and answer questions as to either the

identity of his news sources or information he received in confidence. 408 U.S. at 690, 92 S. Ct. at 2661. However, Justice Powell, whose concurrence is cited as articulating the reporter's privilege, wrote separately to emphasize the scope of the Court's holding, "In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." 408 U.S. at 710, 92 S. Ct. at 2671. Powell said a case-by-case balancing of constitutional and societal interests would be necessary to determine whether First Amendment interests would be jeopardized. *Id.*

So, when the Court in *Herbert* declined to upset the "balance" struck in *New York Times v. Sullivan*, it spoke only to the creation of a new "editorial process privilege," but did not abrogate the already recognized reporter's privilege against disclosure of confidential sources. *Branzburg* was decided after *New York Times v. Sullivan*, therefore the balance Justice Powell spoke of striking, "under circumstances where legitimate First Amendment interests require protection," implicitly included public figure defamation actions. This court cannot think of more compelling circumstances than public figure defamation cases where the journalist is a defendant where legitimate First Amendment interests may require protection. Constitutional protection of the press "reaches its apogee" where the media reports on important and controversial public issues. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Therefore, this court holds under the U.S. Constitution that the press enjoys a qualified privilege against disclosure of confidential sources in public figure defamation cases where the reporter is a defendant.

Just as the holding in *Branzburg* allows for a reporter's qualified privilege against disclosure of confidential sources in public figure defamation actions, so too do the laws of this Commonwealth. Virginia has no reporter's privilege statute, and the Virginia Supreme Court has tailored the privilege to the limits protected by the First Amendment. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721 (5th Cir. 1980), citing *Brown v. Commonwealth*, 214 Va. 755, 204 S.E.2d 429 (1974):

> as a news gathering mechanism, a newsman's privilege of confidentiality of information and identity of his source is an important catalyst to the free flow of information guaranteed by the freedom of press clause of the First Amendment . . . . it is a privilege related to the First Amendment and not a First Amendment right, absolute, universal, and paramount to all other rights.

214 Va. at 756, 204 S.E.2d at 430. The language in *Brown* echoes Justice Powell's concurrence in *Branzburg*.

Having dispensed with the underlying issue of each motion, the court now turns to the specifics of the Motion to Quash and Motion to Compel.

A. *Defendant's Motion to Quash Letters Rogatory and Subpoenas Duces Tecum*

ABC's and amici's premise for opposing enforcement of the subpoenas *duces tecum* served on credit card companies, airlines, telephone companies, etc., is that the discovery is tantamount to asking the reporter himself to divulge the identity of his confidential sources. They argue this type of discovery threatens the press's constitutionally protected functions because reporters must travel and use the telephone in order to gather news and foster the free flow of information. Philip Morris counters that these arguments should be rejected and discovery allowed because one, "the law does not protect parties to a 'confidential' relationship from compromise by neutral third parties to whom they have knowingly imparted their secret," *Reporters Committee for Freedom of Press v. American Telephone & Telegraph Co.*, 593 F.2d 1030 (D.C. Cir. 1978), and two, the privilege is personal to the reporter.

Indeed, this is a difficult and weighty issue with which the court is confronted. What is the scope of the reporter's qualified privilege against disclosure of confidential sources? The court begins its inquiry with *Branzburg v. Hayes, supra*, because that is the case cited as authority for creating the reporter's qualified privilege. As stated earlier, *Branzburg* declined to recognize a reporter's testimonial privilege against appearing before a grand jury and answering questions about his confidential source. The Court was not confronted with whether any recognized privilege encompassed records created and left behind by the reporter as he gathered information and so did not address its comments to this issue.

Philip Morris urges the court to follow the holding in *Reporters Committee* and allow the requested discovery to go forward. *Reporters Committee* is a very different case from the present controversy. In *Reporters Committee*, the court declined to grant plaintiffs, journalists, declaratory and injunctive relief which would have required the federal government to give advance notice to journalists if it wanted to subpoena their toll billing records in connection with a criminal investigation of a possible felony. Throughout the opinion, the court emphasized the limited scope of its holding by pointing out what its opinion did not address:

> the central issue in this case is not whether plaintiffs are entitled to prior notice of subpoenas issued in civil or administrative proceedings, but rather whether plaintiffs are entitled to prior notice of subpoenas issued in the course of criminal investigations.

593 F.2d at 1041. The court noted, and this court agrees, the public interest in ensuring effectiveness of good faith felony investigations is sufficient to override the burden on news gathering which allegedly results from the subpoena of toll billing records. 593 F.2d at 1062-1063. The court found the burden to be slight in view of the fact that in the four years preceding the hearing approximately 150,000 grand jury subpoenas for telephone records had been issued, and none had been for a journalist's records.

The court in *Reporters Committee* had a backdrop of at least fifty years where state and federal law enforcement officials used information from telephone company toll-billing records in criminal investigations and prosecutions upon which to base their holding. 593 F.2d at 1036-1037. No such backdrop exists in public figure defamation cases, or for that matter in civil practice, in regard to the subpoena of third party records in order to trace a journalist's movements and thereby identify confidential sources. This court finds little comfort in the fact that grand juries rarely subpoena the telephone records of journalists, because the practice Plaintiffs ask this court to sanction now would invariably lead to this type of discovery becoming common practice, at least in the realm of libel law. The court cannot and will not endorse such a practice, and refuses to open what can only be described as a "Pandora's Box."

If Plaintiff's were allowed discovery of third party records in order to determine the identity of Defendants' confidential sources, it would be an open invitation for every plaintiff in libel suits, not to mention the potential in other litigation contexts, to make a *pro forma* request for this type of discovery whenever a confidential source is known to exist. A reporter's promise to maintain confidentiality would be meaningless if his movements while investigating were open to scrutiny to glean the identity of his confidential source.

Further, if the reporter's privilege were subject to this type of discovery, then why not other privileged relationships, for example, the attorney/client privilege? The court cringes at the thought of an attorney's credit card records, telephone billing records, etc., being subject to discovery in order to determine the identity of his client or the possible theory of his case to be gleaned from his travels and the witnesses he contacts.

Indeed, this would be the consequence if the court allows Philip Morris to embark down this road of discovery, and it would make all the difference in the future treatment of recognized privileges.

The discovery sought by Philip Morris is an affront to the right to gather news, which is protected by the First Amendment:

> No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions must exist.

*Branzburg*, 408 U.S. at 728, 92 S. Ct. at 2673 (Stewart, J., dissenting). The right to gather news implies a right to a confidential relationship between a reporter and his source. *Id.*

What kind of confidential relationship can hope to be fostered if a source knows, that despite a reporter's promise not to disclose him, that he may be revealed during the course of discovery in a subsequent libel suit? The implications of allowing the subpoena of third party records in order to identify confidential sources are grave and strike at the fundamentals of a free press protected by the First Amendment. This type of discovery will deter sources from divulging information and deter reporters from gathering and publishing information.

ABC correctly argues that a reporter must travel and use the telephone in order to develop stories and foster the free flow of information. True, it is possible for a reporter to employ alternative means of research in order to evade creating a paper trail, but these alternative means, in today's society, are unreasonable and would unduly burden and infringe upon First Amendment freedoms. The gathering and free flow of information would be hampered indeed if a journalist had to drive from state to state, sleep in his vehicle during overnight trips, pay for things only in cash, and seek out pay telephones every time he wanted to communicate with sources, all in order to evade creating records that may later be subject to discovery in libel suits. One of the purposes of modern technology is to make communication and access to information easier, not to deter persons from divulging and gathering information because they are fearful that some evidence may remain of what they believed to be a confidence. Modern technology obviates the need for an extension of the reporter's qualified privilege against disclosure of confidential sources.

The court wants to make clear what it is not saying. If during the course of discovery, a plaintiff identifies an independent, live source of information that can identify the confidential source, the reporter's privilege does not extend to prevent that person from divulging the source's identity. For example, if the journalist and his confidential source are walking down the street and are seen by a passerby who is later discovered, or ride in a taxi and the taxi driver is discovered, nothing done by a journalist can prevent the passerby or the taxi driver from telling a plaintiff what he knows about the person the journalist was with. The independent, live witness is distinct from a record created by a journalist in the course of gathering news. The independent, live witness has an existence separate and apart from any affirmative actions taken by the journalist, whereas the types of records at issue are the fruits, if not the alter ego, of the journalist's news gathering activities and warrant the same protection under the First Amendment as is afforded the journalist.

The subpoena of third party records in order to trace a reporters movements and thereby identify confidential sources is tantamount to asking the reporter directly, therefore the reporter's qualified privilege against disclosure of confidential sources is held to extend to any and all documentary or electronically compiled evidence that is the product of the reporter's news gathering activities.

The permissibility of this type of discovery is subject to the same balance that must occur when determining whether a reporter can be compelled to disclose the identity of his source. As the court is presented with a Motion to Compel Disclosure, it will conduct the balance in the context of ruling on that motion and decide the Motion to Quash at that time.

B. *Plaintiff's Motion to Compel Identification of Confidential Sources and Communications With and About Such Sources*

The court has previously ruled a qualified reporter's privilege against disclosure of confidential sources exists in public figure defamation cases. Therefore, according the guidance of *Branzburg*, the court must balance the interests involved. To aid in the balancing of these interests, courts have developed a three part test: (1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is compelling interest in the information. *LaRouche v. National Broadcasting Co.*, 780 F.2d 1134, 1139 (4th Cir. 1986) (citing *Miller v. Transamerican Press, Inc., supra*). The court will discuss each

prong in turn as it relates to "Deep Cough," the Philip Morris source, and the U.S. government sources.

## 1. *Relevancy*

The information about the confidential sources is clearly relevant to the issue of "actual malice." Philip Morris has limited ability to prove "actual malice" without the confidential sources and information they provided that shaped ABC's state of mind. The court agrees with Philip Morris' arguments presented in its Brief in Support of the Motion to Compel (see pp. 26-32), that "Deep Cough" was the centerpiece of the broadcast. Despite ABC's protestations to the contrary, she was the only individual presented as having first hand knowledge of the alleged improprieties in the cigarette manufacturing process and the only one to specifically accuse Philip Morris. Without "Deep Cough" ABC would have been left with what they had for over a year, public records, conjecture, and unsubstantiated allegations that the tobacco industry engaged in "spiking." Because she was the only source with alleged first hand knowledge, it was upon her credibility alone that ABC based much of its story and drew conclusions, therefore who she is, what she said, and what she did *not* say, shaped ABC's state of mind when it chose to finally broadcast its findings.

The same is true in regard to the Philip Morris source. ABC argues that the Philip Morris source is irrelevant because he was not specifically referred to in the broadcast. The fact this source was not specifically referred to only begs the question. Did the Philip Morris source tell ABC its "spiking" allegations were false, or provide some other information unique to Philip Morris that would have caused ABC to doubt its allegations as they pertained to Philip Morris' manufacturing processes. All of these possibilities are relevant to ABC's state of mind.

Because ABC claimed to have uncovered the tobacco industry's "last best secret" that "had never been disclosed to consumers or the government" and that the investigation "took the government by surprise," the identity and information provided by any government source has a bearing on its state of mind. Pursuant to statute, the government is provided with a confidential list of all additives used by the cigarette industry, therefore any government source may have told ABC its "spiking" allegations were false or unremarkable, because the government already had knowledge.

Clearly, the identity of and information provided by all of the confidential sources is relevant to the issue of "actual malice," an element of Philip Morris' prima facie case.

## 2. *Availability of Information by Alternative Means*

The next prong of the balance is whether the information sought can be obtained by alternative means. Philip Morris seeks to compel the identity of and information provided by all of ABC's confidential sources. The court is in agreement with Philip Morris that this information is not available by means other than compelled disclosure.

The identities of the confidential sources are not discoverable by alternate means. In regard to "Deep Cough," Philip Morris has attempted to learn her identity by serving subpoenas *duces tecum* on nonparties, which are the subject of ABC's Motion to Quash. In addition, non-confidential sources and documents have been produced that reveal third parties who may know her identity, yet at least one of these individuals has already objected to the taking of his deposition on the subject according to the attorney/client privilege. As for the identities of the Philip Morris and U.S. government sources, Philip Morris has attempted identification through Requests for Production of Documents and subpoenas *duces tecum* served on possible agencies for which these sources may be employed. The documents produced have failed to provide Philip Morris with leads as to the identity of these individuals. Further, ABC has curtailed other attempts at discovery by claiming the reporter's privilege against disclosure of confidential sources. These sources could be hundreds of individuals, therefore the discoverability of their identities is impractical through alternate means.

Clearly, the communications with and about these sources cannot be ascertained without disclosure of their identities. There are no alternate sources for what these individuals said to ABC in the course of its investigation. According to ABC, however, the statements made by "Deep Cough" and used in the broadcast about the use of reconstituted tobacco, tobacco extract, extraneous nicotine, and industry motives are corroborated by independent evidence, to which Philip Morris is privy. ABC contends Philip Morris' only interest is in the communications used during the broadcast, which are verifiable through alternative sources.

ABC oversimplifies the statements aired and the relevant information sought. The totality of what "Deep Cough" said to ABC is relevant to its state of mind, not only what it chose to air. To find otherwise would relieve public figure defamation defendants of liability for "knowing falsity or reckless disregard of the truth." Yes, they knew the gist of what they said was false, but perhaps they only aired supporting information that was partially true in order to shield themselves from liability. Surely

this was not the intent of the Supreme Court's holding in *New York Times v. Sullivan.*

ABC has provided Philip Morris with a redacted transcript of its interviews with "Deep Cough," but the redactions are the root of the controversy. Several times during the course of the interview when questioned about Defendants' core allegations, "Deep Cough" seems to hedge, and then what follows are pages of redactions. As discussed earlier, all communications with "Deep Cough" are relevant to the issue of "actual malice." Philip Morris has no way of discovering what "Deep Cough" said off the record, other than asking the reporters or "Deep Cough" directly.

The same is true in regard to the Philip Morris and U.S. government sources. With both it is unclear what, if anything, these sources provided to ABC during its investigation; however, all of it may be relevant to the issue of actual malice. The only way to ascertain this information, especially because so little is known about these individuals, is to ask them or the reporters directly.

### 3. *Compelling Interest in Information Sought*

The information sought is relevant to the issue of "actual malice." Therefore, the question is whether Philip Morris' need to prove "actual malice" in their case in chief, is compelling enough to overcome the First Amendment's reporter's privilege against disclosure of confidential sources.

ABC argues, relying on federal and state authority from many jurisdictions, first, that the need is not compelling because "Deep Cough" is not the only source for the allegedly defamatory statements, second, the need is not critical to prove alleged falsity, third, there is no compelling reason why the source is necessary to show "actual malice," and fourth, even if critical to show "actual malice," the present record is insufficient to show that the case rises or falls on that evidence.

ABC cites much authority for each of these propositions; however, the balance struck is unique in every case and *Branzburg* demands a case-by-case analysis. Based upon the facts of this case and the needs of this public figure plaintiff, the court is of the opinion that there is a compelling interest in the information sought.

First, there is no rule in First Amendment jurisprudence that prior to compelling the disclosure of and information about a reporter's confidential source, that the person be the sole source of the allegedly defamatory statements. However, in this case, the record indicates ABC felt it had no

story, for over a year, until "Deep Cough" agreed to be interviewed. "Deep Cough" was the core of the broadcasts. She was the only industry insider who alleged "spiking" by Philip Morris and the only industry insider presented who confirmed ABC's allegations of improper conduct and motive by the cigarette manufacturers.

Second, Philip Morris has little hope of proving "actual malice" absent a full understanding of the reporters' states of mind. In order to acquire a full understanding, Philip Morris must have access to all that ABC knew. It would be unfair of the court to require a public figure plaintiff to rely solely on the representations of a defendant as to what it knew in regard to the veracity and reliability of all of its sources. The court can imagine few defendants who will say, "Sure, I knew my confidential source was lying, but I went ahead with the story anyway."

ABC cites the court to an Eighth Circuit case which says there must be "a concrete demonstration that the identity of defense news sources will lead to persuasive evidence on the issue of malice . . . Mere speculation . . . will not suffice." *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972). Under the present facts, the court finds this statement circular. How on earth could Philip Morris have concrete evidence that disclosure will lead to persuasive evidence on the issue of malice, unless it knew who the sources are or what the sources told the defendants. To require such a stringent showing is tantamount to forcing a plaintiff to prove "actual malice," an element of the prima facie case, at the discovery stage.

Third, as to the sufficiency of the record at this time, ABC urges the court to wait until discovery has progressed prior to finding a compelling need for disclosure. ABC claims Philip Morris lacks evidence that the case will rise or fall on the information sought. The information sought is relevant to the issue of actual malice. Philip Morris will lose if it is unable to prove ABC knew its allegations were false or were made with reckless disregard for the truth. This court is in agreement with the reasoning of those jurisdictions which have held that no reporter's privilege exists in public figure defamation cases, although we have declined to go as far, that it would be "untenable to impose the heavy *New York Times* burden of proof upon plaintiff and at the same time prevent [it] from obtaining the evidence necessary to meet that burden." *Downing v. Monitor Publishing Co.*, 120 N.H. 383, 386, 415 A.2d 683, 685-686 (1980). There must be a balanced playing field, and the information Philip Morris needs to prove "actual malice" is unavailable. It is upon this reasoning, under the present facts, that the court finds Philip Morris has a compelling need for disclo-

sure of the identity of the confidential sources and their communications because its case necessarily rises or falls with the information sought with or without further discovery.

An additional factor taken into consideration by the court in finding a compelling interest in the information sought is the substantial public interest involved in regard to the issues at the heart of this litigation.

This court holds that the qualified reporter's privilege against disclosure of confidential sources in public figure defamation cases where the reporter is a party has been overcome by Philip Morris in this case and will order disclosure of the identity and communications about and with "Deep Cough," the Philip Morris source, and any U.S. government sources. In regard to any other confidential sources ABC may have, the court finds insufficient evidence at this time to warrant compelling disclosure of anything about them.

Accordingly, the Motion to Compel Defendants to Identify their Confidential Source and All Communications With and About Such Sources is granted with the above qualification and the Motion to Quash Subpoenas *Duces Tecum* is denied.

### Order

This matter came before the court on January 6, 1995, upon Defendant's Motion to Quash Letters Rogatory for subpoenas *duces tecum* served on American Express, Citibank, USAir, United Airlines, Continental Airlines, Hertz Corporation, Adam's Mark Hotel, AT&T, Cellular One, Bell Atlantic, MCI, Sprint, and NYNEX, and Plaintiff's Motion to Compel Disclosure of the identity and communications with and about all of Defendant's confidential sources.

For reasons stated in the court's letter opinion to counsel, it is ordered that the Motion to Quash is denied. The Motion to Compel Disclosure is granted with respect to the former R. J. Reynold's employee, the former Philip Morris employee, and any and all sources in the U.S. government and the defendants shall comply by providing responses to the Motion to Compel Disclosure within ten days of the date of this order.

### April 19, 1995

From my review of your drafts for orders amending the protective order to cover informal discovery, it is apparent that I have not clearly articulated my decision regarding the confidentiality agreement.

First: Any confidentiality agreement protects covered material from disclosure except on formal discovery. It would not prevent the employee from disclosing the fact that he held confidential information, but he could not disclose the information without violating the agreement absent formal discovery.

Second: I do not intend to absolve anyone of breaches of the confidentiality agreement and for that reason suggested the disclosure procedure so that the interviewer and the interviewee would be aware of its existence.

Third: The reason for treating *all* material received in informal discovery at a high level of confidentiality was to avoid the problem of placing the interviewer, interviewee or ABC counsel in the position of determining what was and what was not material protected under confidentiality agreements. Further, to the extent the material is protected, there would be few, if any, damages suffered by Philip Morris, thereby minimizing the possibility of litigation. Therefore, I proposed that all material would be treated as confidential unless released from that category as allowed under the existing terms of the protective order.

The sketch proposed by Philip Morris best articulates my decision. Accordingly, it has been entered. I did add on page 2 that any pre-interview notice could be made verbally, as well as in writing.

### May 5, 1995

This matter is before the court on the Defendant's (ABC) motion for sanctions against the Plaintiffs (Philip Morris) on account of Philip Morris' alleged failure to produce documents except after objection, and motion and hearing.

Among many items for which ABC sought production, it requested Philip Morris to produce documents which contained the formulas for the contents of its cigarettes. As can be imagined, this is extremely sensitive trade information.

Philip Morris produced some twenty-five boxes of material containing the formulas. ABC complains, however, that the formulas were produced on a special type of paper which is red in color, is difficult to read, emits an unpleasant odor, and is incapable of being copied or read by an optical scanner for incorporation into a computer data base.

The court has reviewed samples of the materials produced. The paper utilized is apparently a specially treated red paper with a distinctive background. The contents are typewritten in black ink. ABC complains that the material is difficult to read, and the court finds that reading from this

material is not as comfortable as from the usual black writing on white paper format but is not unduly difficult. ABC has also complained that the paper contains an unpleasant odor which the court did not observe.

After much discussion and negotiation, Philip Morris has agreed to produce some of the material on white reproducible paper. ABC claims, however, that Philip Morris failed to produce as required by Rule 4:9 of the Rules of the Supreme Court of Virginia and should be sanctioned. It also complains that a comprehensive protective order was negotiated and entered and that this adequately protects Philip Morris' interest in preserving its trade secrets. Further, ABC says that Philip Morris violated at least the spirit of the order in adding the extra element of protection from the Protective Order in that the material supplied is not reproducible.

This is a matter of first impression. No party has cited nor has the court found any authority supporting the position of either party.

The analysis of this issue is resolved by the answer to the question: Did Philip Morris comply with Rule 4:9(a)? The court is satisfied that Philip Morris has not violated any of the terms of the Protective Order. ABC has no rights or expectations nor does Philip Morris have any obligations beyond those which arise from the rule. Rule 4:9(a) provides in pertinent part:

> Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 4:1(b) and which are in the possession, custody, or control of the party upon whom the request is served . . . .

In practice, the rule is seldom literally complied with. Usually the party called upon to produce documents goes beyond the Rule and produces copies of the documents directly to the requesting party. Seldom does the producer make materials available for inspection and copying as is prescribed in Rule 4:9(a). In this case Philip Morris has exceeded the requirements of the rule and has produced copies of the documents requested by

ABC. It has, therefore, complied with the rule and is not subject to sanction.

The material contains the information requested by ABC in reasonably usable form. The Rules do not contemplate that materials produced lend themselves to easy assimilation into data bases, nor do they necessarily contemplate wide dissemination of further copies. This ruling should not be misunderstood to say that assimilation into data bases and dissemination of copies are not desirable or even essential in modern trial preparation. The court simply observes that the rule requires no more of Philip Morris than it has done.

### July 11, 1995

Before the court are two motions, Philip Morris' Motion to Amend requesting leave of court to file a Second Amended Motion for Judgment, and ABC's Motion for Reconsideration of the Court's Order Compelling Disclosure of Defendants' Confidential Sources. The court will consider first the Motion to Amend.

### I. *Motion to Amend*

In addressing the demurrer with which ABC attacked the Amended Motion for Judgment, in its letter of December 30, 1994, the court analyzed paragraphs 7, 8, and 13 to demonstrate that Philip Morris had indeed, contrary to ABC's argument, "base[d] its cause of action upon the falsity of the assertion that cigarette manufacturers intended to 'hook' or addict smokers by the addition of nicotine." The court went on to say that although "not pleaded that way, the court agrees with Philip Morris' argument that the allegation that it adds nicotine to cigarettes when it does not is in and of itself defamatory."

Philip Morris now seizes on that statement and seeks to amend its motion for judgment in such a manner as to eliminate any reference to motive, basing its cause of action solely on the issue whether it adds nicotine to cigarettes. The parties have agreed to consider the broadcast tapes and transcripts as a part of the pleadings, and the court is, therefore, obliged to consider that factual milieu in making a determination on what may be appropriately pleaded. After reviewing the tape and transcript of the broadcast again in light of this motion, the court agrees with ABC that the court's statement in the December 30, 1994, letter is still the framework within which Philip Morris must work:

From the pleadings and from the court's review of the broadcast tapes and transcripts, the gist of the broadcast is that the "fortifying," "spiking," "manipulating," cigarettes with nicotine occurs in the production of reconstituted tobacco. The broadcast implies that nicotine which does not belong there, i.e., which is extraneous, is added to the tobacco so as to hook smokers.

The court cannot, and Philip Morris cannot, ignore the entirety of the broadcast, in favor of a selected few words but must deal with the context. In this case, the court has before it a perfectly preserved memorialization of the alleged defamation, as a part of the pleading, and agrees with ABC that it demonstrates that the allegations of motive cannot be extricated from the allegations of "fortifying." The value-related connotations of the words that ABC employed in its broadcasts, "spiking," "fortifying," "adding," indicate something more than a recombination of ingredients that had been formerly separated. Therefore, Philip Morris' motion to amend is denied insofar as it requests permission to eliminate the element of motive.

The motion is granted, however, as to the request to add the allegation of a defamatory news release published on February 24, 1994. Since it deals with the same subject matter and similar, if not exactly duplicative, charges by ABC into the conduct of Philip Morris, there should be no prejudice or surprise to ABC by allowing this amendment, and ABC should not need additional time to prepare to meet the count.

If Philip Morris wishes to file a Third Amended Motion for Judgment consistent with this ruling, it may do so on or before July 20, 1995. ABC may respond to any amended pleading within ten days of service upon its counsel.

## II. *Motion for Reconsideration*

Because of the constitutional dimensions of the confidential source issue in this case, the court granted ABC's request to entertain a motion for reconsideration. Concluding that it may have acted without sufficient proof of Philip Morris' compelling need in ordering disclosure of the confidential sources at too early a juncture of the litigation, the court has deliberately delayed making a ruling, assuming that the filing of ABC's "dispositive" motion was imminent and that discovery might obviate the

need for confronting this constitutional issue. However, nothing has occurred and it is time to announce the court's conclusions.[1]

Initially, the court wishes to reaffirm its ruling that there does exist a qualified reporter's privilege against disclosure in public figure defamation cases for the reasons set forth in the court's letter of January 26, 1995. Having reached that conclusion, however, the court has determined that prudence suggests that Philip Morris go further to convince the court that its need for discovery of the confidential sources is compelling. At the time that decision was made, insufficient discovery had been completed to enable the court to comfortably reach that conclusion.

In *Branzburg v. Hayes*, 408 U.S. 665 (1972), the Supreme Court described a three-part analysis that a court should make before declaring that confidential sources be disclosed.

The first part of the analysis is to determine whether the information is relevant. The court concluded that the information sought was relevant to the issue of ABC's state of mind in deciding to air the broadcast. Therefore, it would bear on "actual malice," which is an element of Philip Morris' prima facie case. That conclusion has not changed.

Next is whether the information sought is available by alternative means. Philip Morris needs to show that it has exhausted other reasonably available sources of the information and has not been able to discover the information likely to be held by the confidential sources. What was shown was the efforts made at a very early stage of discovery.

The third and last part of the test is whether there is a compelling interest in the information sought. Prudence suggests that Philip Morris go further to establish a record that further convinces the court that its need for discovering the confidential sources is, indeed, compelling. There may yet occur, during the course of discovery, the revelation of sufficient information from other sources that it will not be necessary to impinge on the qualified privilege.

Because of the foregoing reasons, the court now grants ABC's motion to vacate the order compelling the disclosure of ABC's confidential sources.

### Order

On January 12, 1995, came the plaintiffs, by counsel, having filed a Motion to Amend, requesting leave of court to file a Second Amended

---

[1] Yesterday, ABC filed a Motion for Summary Judgment. Argument is not scheduled until next month.

Motion for Judgment and a Memorandum in Support of Their Motion, and the defendants, by counsel, having filed a Memorandum in Opposition. Based on the arguments contained in the memoranda and on the arguments and representations of the parties at the hearing on this matter on March 1, 1995, it is ordered that:

1. The Motion to Amend is denied insofar as it requests permission to alter the pleading in such a manner as to eliminate the element of motive for the alleged "spiking." The court has concluded that the "sting" of the broadcasts was that Philip Morris "spiked" its cigarettes with nicotine *in order to* "hook" smokers or "to keep people smoking."

2. The Motion to Amend is granted as to the request to add the allegation of a defamatory news release published on February 24, 1994, if, after receipt of the ruling in number one, above, Philip Morris remains so advised.

3. If Philip Morris wishes to file a Third Amended Motion for Judgment consistent with this ruling, it may do so on or before July 20, 1995. ABC may respond to any amended pleading within 10 days of service upon its counsel.

The objections of the parties to any rulings which are adverse to them are noted.

### Order

On February 13, 1995, came the defendants, by counsel, having filed a Motion for Reconsideration of the Court's Order Compelling Disclosure of Defendants' Confidential Sources and a Memorandum in Support of Defendants' Motion, and the plaintiffs, by counsel, having filed a Memorandum in Opposition. Based on the arguments and representations of the parties at the hearing on this matter on March 1, 1995, and for reasons stated in the court's letter opinion to counsel, it is ordered that the order of this court entered on January 26, 1995, compelling the disclosure of defendants' confidential sources is hereby vacated.

The objections of the parties to any rulings which are adverse to them are noted.

### August 4, 1995

On Friday, August 4, argument was presented on ABC's Motion to Exclude "Journalistic Standard" Expert Testimony. Upon examination of the authority, the court is of the opinion that the motion should be overruled.

Both parties agree that "Journalistic Standard" experts may offer evidence that is relevant to the issues that must be decided by the jury. See *Hart-Hanks, Inc. v. Connaughton,* 491 U.S. 657 (1989). ABC contends, however, that in Virginia, journalistic standards evidence has been held to be unnecessary to be of assistance to the jury and is, therefore, inadmissible. *Richmond Newspapers v. Lipscomb,* 234 Va. 277 (1987).

The analysis of the admissibility of expert testimony begins with Va. Code Ann. § 8.01-401.3 which provides:

> A. In a civil case, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

This rule is little different from that articulated by the Supreme Court of Virginia in *Richmond Newspapers v. Lipscomb, supra;* i.e., that assuming the witness is properly qualified, opinion testimony may be given "if it will assist the trier of fact to understand the evidence or determine a fact in issue."

In *Lipscomb,* the Supreme Court of Virginia concluded that the only issue for the jury to determine was whether the reporter should have conducted further interviews before publishing a story about student and parent dissatisfaction with a public school teacher. The court characterized that as a "simple" issue which the jury was fully competent to decide for itself.

This case is somewhat different from *Lipscomb,* in at least the following respects. First, this is a public figure defamation case which requires the plaintiff to prove a higher degree of malice than *Lipscomb,* a private individual. Second, *Lipscomb* involved an issue whether sufficient investigation had been performed. This case will probably not only involve the extent of investigation by the reporters but the manner, means, and methods employed in the investigation. Finally, this case will also probably involve the assembly of information from an investigation of over one year's duration into a thirty-minute TV program. Materials are left out, edited, etc. Was this done with an eye to accuracy or to express a point of view? Each of these characteristics presents a significant departure from the "simple" issue presented in *Lipscomb. Lipscomb* is, therefore, not controlling except to the extent that like *Lipscomb* this is not a journalistic malpractice case. Here evidence of departure from or adherence to jour-

nalistic standards is but some evidence that may assist the jury in deciding the malice issues. Under Va. Code Ann. § 8.01-401.3 it should be admissible.

The court notes that it is working at some disadvantage in being presented with this *in limine* motion without any benefit of a proffer by the plaintiff of what its questions of the witness will be and, therefore, what specific issues it will address with the witness. It is for that reason that *in limine* motions are disfavored by this court. Plaintiffs have no reason to proffer anything at this stage. With this impediment in mind, the court has endeavored to give counsel the benefit of its analysis with the hope that they will find it of assistance in trial preparation. The court does not invite further discussion of the issue but realizes that it may be revisited to assure compliance with Va. Code Ann. § 8.01-401.3.